George David PHIFER, Appellant,

v.

The STATE of Texas, Appellee.

No. 64359.

Court of Criminal Appeals of Texas,
En Banc.

May 25, 1983.

Ed T. Smith, James S. Moss (on appeal only) Bonham, for appellant.

William E. Gandy, Dist. Atty., and Dan Meehan, Asst. Dist. Atty., Bonham, Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

In a jury trial appellant was found guilty of murder; punishment was assessed at confinement for life.

Appellant attacks the admission into evidence of a written statement made by him as a result of custodial interrogation, a statement which formed the core of the case against him. He complains of violations of his rights under the Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States, and under the Texas Constitution and Code of Criminal Procedure.

Appellant contends, and we agree, that the trial court erred in refusing to suppress a written statement made by appellant as a result of custodial interrogation. The statement was made in the absence of defense counsel after appellant had invoked the right to have counsel present during interrogation, and the statement was admitted into evidence without sufficient proof by the State that appellant waived that right.

A pretrial hearing to determine admissibility was conducted in accordance with *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). A few days before trial, the court filed findings of fact and the conclusion that appellant's statement was admissible.

The court found that appellant was a poorly educated twenty eight year old black male who was unable to read or write except to sign his name.[1] According to a psychologist's report, which the court adopted in its findings, appellant's "I.Q. score is 69, which places him in the low level of the Borderline range of intellectual functioning in comparison to his peers (the Borderline mental retardation range being from 68 to 83)."

On January 2, 1979 appellant was arrested at his home in Hunt County, was taken to the county jail, and was arraigned before a justice of the peace. Later that same day Fannin County Sheriff Sam Patton took custody of appellant and transported him to Fannin County, where he was again arraigned and was placed in the Fannin County Jail.[2] At no time on that date did appellant request an attorney.

On January 2 or 3 Marion Greer, Deputy Sheriff of Delta County, asked permission of Patton to interrogate appellant. Patton granted permission because both appellant and Greer are black, and, in Patton's opinion, "one black will talk more freely to

---

1. The facts set out in this opinion have been gleaned, except where indicated, from the trial court's findings of fact and from the testimony given at the suppression hearing by sheriffs, deputies, and counsel.

2. The body of the victim had been discovered in Fannin County.

another black." [3]  On January 3 Greer and Delta County Sheriff Bennie Fisher arrived at the Fannin County Jail and interrogated appellant, who, after seeing photographs depicting the badly decomposed victim and the manner of his killing, agreed to give a statement.[4]

John Morris, County Attorney of Fannin County, arrived to take the statement. He brought with him for that purpose a secretary and tape recorders. Because the room was too crowded, Morris and others stepped outside and closed the door, but Patton, Greer, the secretary, and the tape recorders remained inside with appellant. After five or ten minutes the secretary emerged and told Morris that appellant had requested an attorney. Morris asked Patton to play back the tape recording. The testimony of Morris regarding the recording appears in the record as follows:

> "[Patton] flipped it on and what I heard was Sam Patton read the warning like from the top of a sheet like this to the Defendant and he said, 'George, do you understand these.'
>
> I heard a mumbling, something like, 'Uh-huh,' and then Sheriff Patton said something like, 'Okay. Now, you can go ahead.' And I don't know—it was not very clear because he was talking very softly and I think he said, '*I want to see a lawyer*,' or, '*I want to talk to one first*.' [5]
>
> Q [Defense counsel]: To make a long story short; did you arrange for a lawyer to be appointed?
>
> A: Within the hour I came up here and drew up an order and had Justice of the Peace R.F. Mankin then appoint an attorney to represent him.
>
> Q: Was that the last time that you have seen this man, aside from when he has been brought up for pretrial hearings?

**3.** Greer was acquainted with appellant, having arrested him previously for a different offense when Greer was a police officer in Commerce in Hunt County. Delta and Hunt Counties adjoin Fannin.

**4.** Fisher testified that any person who viewed the photographs could have described the killing without ever having been to the scene.

A: The only other time would be here in Court.

Q: I mean you never were called back to the jail?

A: No."

The authorities did not interrogate appellant further on January 3. On January 3 or 4 David Turner, court appointed counsel, first conferred with appellant at the jail.[6] Turner then told Patton and his deputy, Frank Conner, that appellant was not to be questioned by anyone except in the presence of defense counsel. Patton and Conner agreed.

Greer and Fisher arrived from Delta County to visit appellant for the second time on January 5. Greer testified that he went to visit appellant because Patton telephoned to say that appellant wished to see Greer.

Defense counsel arrived for a conference and discovered that appellant had been interrogated in violation of the agreement between counsel and Patton. Patton testified that defense counsel had not been notified because, at some unspecified point, appellant stated that he did not wish to have his attorney present. Appellant's mother was present.

Appellant already had given the officers a statement, a typed version of which awaited his signature. After arrival of counsel appellant refused to sign the statement.

Defense counsel complained to the trial court and to Morris, the aforementioned county attorney, about the interrogation in absence of counsel. Morris telephoned Patton and told him that appellant was not to be questioned without defense counsel present. Patton agreed. At the *Jackson-Denno* hearing Morris recalled his instruction to Patton as follows:

**5.** All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

**6.** Turner represented appellant initially, but he withdrew before the *Jackson-Denno* hearing.

"Generally, the words were that 'I have talked with David Turner and he doesn't want any officers talking with his client unless he is there and we are going to have to follow the rules.' "

However, Patton did not follow the rules.

Greer testified that on January 9 Patton telephoned him and said that appellant again wished to talk to Greer, so Fisher and Greer went to see appellant for the third time. During that visit the officers finally obtained a signed statement from appellant, but not without much difficulty. Fisher testified that he and Greer were alone with appellant at the Fannin County Sheriff's Office on the morning of January 9. Neither Fisher nor Greer could remember any particular questions they asked before or during appellant's giving of the statement. On this point Greer testified as follows:

"Q [Defense counsel]: Was there any preliminary conversation with Mr. Phifer before you got down to the statement taken?

A: I don't remember. All I remember is the statement. I don't remember what questions were asked or whatever, what conversation went on at that time, I don't know."

After an hour or an hour and a half on the morning of January 9, Fisher and Greer obtained a statement from appellant.[7] In that statement appellant did not say that he was the killer; instead, he implicated two other persons. Fisher, Greer and appellant ate lunch together, according to Greer's trial testimony.[8]

After lunch appellant began weeping. He tore the written statement into pieces and said that he could not "squeal on anybody." [9] Then he gave another statement in which he implicated only himself. That statement was signed by appellant, and it formed the foundation of the State's case.

It was introduced at the suppression hearing as State's Exhibit Number One and at trial as Number Fourteen.

It is clear that counsel was not present when appellant gave any of the statements mentioned above, including the last one.

The question now before us is whether appellant waived his right to the presence of counsel during custodial interrogation. The right to which we refer is not the *Sixth* Amendment right to the assistance of counsel—"that a person is entitled to the help of a lawyer at or after the time judicial proceedings have been initiated against him [ ] 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment,' " [10] but the *Fifth* Amendment right to have counsel *"present during custodial interrogation,"* identified in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). See *Stone v. State,* 612 S.W.2d 542 (Tex.Cr.App.1981).

Appellant personally invoked the right to the presence of counsel during custodial interrogation on January 3. Defense counsel invoked the right for appellant after their first meeting. And, on or after January 5, the county attorney, at the insistence of defense counsel, instructed the Fannin County Sheriff that appellant was not to be questioned in the absence of counsel.

Concerning circumstances similar to those now before us, the *Miranda* Court spoke as follows:

"If the interrogation continues without the presence of an attorney and a statement is taken, *a heavy burden rests on the government to demonstrate* that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."

---

7. Fisher testified that appellant signed it. At trial Greer said that appellant refused to sign.

8. The trial court's finding that the officers and appellant "separated for lunch" is not supported by the testimony.

9. The officers made no effort to preserve the pieces of the statement, but they recalled some of the contents.

10. *Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977), quoting *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972).

Supra, 384 U.S. at 475, 86 S.Ct. at 1628. See also *North Carolina v. Butler,* 441 U.S. 369, 372–373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979) and *Faulder v. State,* 611 S.W.2d 630, 641 (Tex.Cr.App.1980) (Opinion on State's Motion for Rehearing). Thus, the question of waiver turns on whether the State has met its "heavy burden" of establishing a "knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding the case, including the background, experience and conduct of the accused.' *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) [other citations omitted]." *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

The trial court found that the confession was "freely and voluntarily made." But the question of "voluntariness" is an inquiry discrete from whether a knowing and intelligent waiver occurred. Neither is our question answered by any finding that appellant waived the right to have his attorney present *during the making of the statement.* Our understanding of the right here relied upon is that the Fifth Amendment guarantees the presence of counsel during *interrogation,* which by definition is designed to elicit,[11] and necessarily precedes, an incriminating response. Moreover, on the question of waiver,

"*Miranda* teaches that no weight is to be given a failure on the part of the accused to specifically request an attorney's assistance or that interrogation cease in the exact language of that case, or, for that matter, at all; likewise, the mere fact 'that appellant answered the officers' questions raises no presumption of waiver.' "

*Faulder,* supra, at 641. And the Court in *Edwards* concluded that analysis by observing that Edwards' "statement, made without having had access to counsel, did not amount to a valid waiver. . . ."

What then must the State prove in this context in order to establish waiver?

". . . [A]lthough we have held that after initially being advised of his Miranda rights, the accused may himself validly waive his rights to respond to interrogation, see *North Carolina v. Butler,* supra, [441 U.S.] at 372–376, [99 S.Ct. at 1756–59] the Court has strongly indicated that *additional safeguards are necessary when the accused asks for counsel;* and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that *an accused,* such as Edwards, *having expressed his desire to deal with the police only through counsel, is not subject to further interrogation* by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges or conversations with the police.*"

\*   \*   \*   \*   \*   \*

"[I]t is inconsistent with Miranda and its progeny for the authorities, *at their instance,* to reinterrogate an accused in custody if he has clearly asserted his right to counsel." *Edwards,* supra, 451 U.S. at 484–485, 101 S.Ct. at 1885.

In light of *Edwards* and the facts outlined above, *the burden on the State at the suppression hearing was to prove that,* after the January 5th second meeting between appellant and the officers from Delta County, and after defense counsel, through the county attorney, again had instructed Patton that no interrogation was to occur without defense counsel present, and after Patton again had agreed, *appellant initiated the January 9th meeting,* at which he gave the final inculpatory statement. The trial court found as follows:

"*Sometime prior to January 9 the defendant told Sheriff Patton that he wanted to talk to Deputy Greer.* On the morning of January 9 Sheriff Patton tel-

---

11. *Rhode Island v. Innis,* 446 U.S. 291, 100      S.Ct. 1682, 64 L.Ed.2d 297 (1980).

ephoned Sheriff Bennie Fisher of Delta County and told him of the defendant's request to talk with Deputy Greer of the Delta County Sheriffs Department. *Sheriff Fisher and Deputy Greer thereupon came to the Fannin County Jail in Bonham and, with Sheriff Patton's permission, talked with the defendant. This was in violation of Sheriff Patton's promise to Mr. Turner.* Mr. Turner was not contacted by either Sheriff Patton or Sheriff Fisher or Deputy Greer or anyone else and advised that the defendant was about to be questioned by Sheriff Fisher and Deputy Greer."

The trial court did not, and neither can we, determine exactly when or under what circumstances appellant told Patton, prior to January 9, that he wished to talk to Greer. Patton went to appellant's cell sometime after making the agreement with counsel on January 3 or 4 and before Greer's third meeting with appellant on January 9. Patton never fully explained why he went to appellant's cell, when he did so, or what he said to appellant. Instead, Patton evaded defense counsel's questions:

"* * *

Q: What were the circumstances surrounding your visiting with this man at that time, the time that he told you he wanted to talk to Greer? Why were you talking to him?
A: Why were I talking to him? [sic]
Q: Yes.
A: I try to make it a point to talk to all of my prisoners at one time or another.
Q: Were you talking to him about this case?
A: Not particularly, no.
Q: Just visiting?
A: I visit occasionally, yes.
Q: Was it in your office or upstairs in the cells that this happened?

A: I am going to say it was in a cell.
Q: You are saying that he said, 'I want to see Marion Greer?'
A: Yes, he has requested he wanted to see Marion. [sic]
Q: Did he tell you why he wanted to see him?
A: He said he would talk to Marion.
Q: But he wouldn't talk to you, is that what you are saying?
A: Well, it boils down to about the same thing."

Patton's testimony indicates that he, not appellant, initiated Patton's own "visit" with appellant, after being told not to talk to him in absence of counsel. Patton's testimony does not show whether the resulting meeting between Greer and appellant was appellant's idea or a suggestion by Patton in which appellant merely acquiesced in order to get Patton to leave him alone. Thus, this case again is reminiscent of *Edwards,* in which the accused, confronted illegally by detectives who wanted to talk to him, "stated that he would talk, but what prompted this action does not appear." *Edwards,* supra, at 487, 101 S.Ct. at 1886.

Patton could not remember how many times he and others interrogated appellant between January 2 and 9. Neither could he recall when appellant said he would talk to Greer. Patton could only state, *"I don't know whether it was on the second or third occasion* but George David [appellant] did ask to see Mr. Greer again."

Thus, if Patton's testimony makes anything clear, it is that appellant was willing to see Greer only once, and that appellant expressed himself to Patton on the subject before the second meeting with Delta County officers on January 5, or before the third meeting on January 9, but not twice. *Patton never testified that appellant initiated Greer's January 9th visit.*[12] Greer and

---

12. When defense counsel suggested to Patton at trial that Greer might have met with appellant three times, Patton could not clearly recall *who had initiated any particular visit:*

"A: I would say that he [Greer] might have been there on three occasions.
Q: Three seems reasonable to you?

A: Possibly.
Q: The first of which he called you, right?
A: I believe that's right.
Q: The second one I suppose you called him.
A: Probably so.
Q: *What about the third one?* [January 9]

Fisher testified that they never asked appellant and that appellant never indicated to them whether he had asked to see them on any occasion.[13]

At the suppression hearing the State was unable to prove, and the trial court did not find, that appellant, rather than Patton, actually initiated any particular meeting with Greer, let alone the meeting of January 9, in which the final signed statement was obtained.[14] As noted above, the trial court found that the January 9th meeting was in violation of Patton's agreement with counsel. In *Stone,* supra, custodial interrogation in violation of such an agreement rendered the appellant's statement inadmissible.

Furthermore, the record before us does not support the trial court's finding that, before Greer and Fisher began interrogating appellant on the morning of January 9, appellant stated "that he did not want to have his lawyer present prior to or during any questioning." In its brief the State points to that part of the record dealing with the interrogation of appellant on the afternoon of January 9, not the morning session:

"Q [Prosecutor]: At or about 1:55 p.m. on that date did you have an occasion to see a man you knew to be George David Phifer?
A [Fisher]: Yes, sir.

\* \* \* \* \* \*

Q: Did he tell you at that time whether or not he desired to consult a lawyer?
A: He said he did not."

A: *I don't remember on that one.*
Q: You don't remember why he came at all?
A: *No.*"

**13.** Appellant testified that he was afraid of Greer and had never asked to see him. Appellant also denied ever waiving the right to have counsel present during questioning.

**14.** Even if appellant expressed a willingness to meet with Greer, rather than with other officers, his preference was not respected, according to Greer's trial testimony:

"Q [Defense counsel]: Do you recall having interrogated Mr. Phifer on three occasions?

By 1:55 p.m., when appellant stated that he did not wish his attorney to be present, he already had undergone a morning session of interrogation. He had made a statement, had lunched with his interrogators, had broken into tears, and had destroyed the morning statement, crying, "I can't squeal on anybody." Because the State failed to prove that appellant initiated the January 9th visit, it is irrelevant that at some time during that illegal meeting appellant stated that he did not wish his attorney to be present. This Court will not fashion a rule that the police may violate a prisoner's Fifth Amendment right to the presence of counsel as long as they eventually obtain from him during the interrogation a statement that he does not wish counsel to be present while he confesses. See *Wilkerson v. State* (Tex.Cr.App., No. 68,937, delivered May 18, 1983).

The State has failed to carry the heavy burden of proving that appellant knowingly and intelligently waived his right to the presence of counsel during the custodial interrogation on January 9, 1979, the interrogation which eventually elicited the final incriminating statement.[15] Indeed, the record as a whole shows that the authorities repeatedly and flagrantly ignored their agreement with counsel, violated the mentally impaired prisoner's right to counsel, and did their best to conceal the interrogation from defense counsel and the county attorney, until they broke appellant's will to resist and obtained a signed

A: Yes, sir, I do. I was in the room—let's get the record straight. I was present in the room each time that he was interrogated. *I wasn't the one interrogating him.*"

**15.** Even under the more open approach to the waiver question taken by Justice Powell, concurring only in the judgment of the Court in *Edwards,* the State has failed to meet its burden of proof in the instant case, viz: "a free and knowing waiver of counsel *before interrogation commenced.*" Although *Edwards* had not yet been decided when this case was tried and briefed on appeal, nevertheless, it controls the disposition made here. *Coleman v. State,* 646 S.W.2d 937 (Tex.Cr.App.1983).

statement.[16] If the Fifth Amendment right to counsel serves any purpose, it is to prohibit such police conduct.

We hold that the trial court committed reversible error in admitting into evidence the statement obtained from appellant in violation of his Fifth Amendment right to the presence of counsel during custodial interrogation.

Because we dispose of the case under the Fifth Amendment as applied to the states by the Fourteenth, we need not address appellant's claims that his signed statement was obtained in violation of the Sixth Amendment and in violation of state law.[17] Even so, we must consider appellant's contentions that the State failed to adduce sufficient evidence to prove the identity of the deceased and the manner or means of death. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).

■ The identity of the deceased was sufficiently established as Fred Hamilton, the victim named in the indictment, by a comparison of a chest x-ray of the body of the deceased with a chest x-ray of Hamilton during his life. Contrary to appellant's contention, the x-ray taken of Hamilton during his life was adequately authenticated by the Assistant Director of the Department of Radiology at Baylor Hospital in Dallas, the custodian of the x-ray records at that institution. See V.A.T.S., Article 3737e, §§ 1 and 2.

The indictment alleged that appellant caused the death of the victim by "choking him with a wire." At trial the Dallas County Medical Examiner testified that the victim was not "choked" to death in the medical sense of cutting off the air supply to the lungs. Rather, he died from asphyxiation by "strangulation," which the examiner defined as cutting off the blood flow to or from the brain. The examiner also testified that, in nonmedical language, "choking" and "strangling" are used similarly.[18] There was no dispute about the actions of the killer or killers. The victim was garroted by means of a wire placed around his neck and tightened.

The contention made here, that a variance developed between the allegation of "choking" in the indictment and the proof adduced at trial, is similar to that made in *Skidmore v. State,* 530 S.W.2d 316 (Tex.Cr. App.1975). In that case the indictment alleged that the accused killed the victim by pushing him over an embankment. The medical expert testified that the victim died of asphyxiation after his head struck the ground and he lay face down, unable to breathe. In other words, "medically speaking," it was not the push, or the fall, or the sudden stop that killed him; it was the way he lay afterwards that constituted the eventual cause of death. This Court found no fatal variance.

■ In this case the actions of the killer or killers in tightening a wire around the

16. Although we need not rely on such statements, we note certain admissions made by appellant's jailers, which demonstrate a determination on their part to obtain a statement from appellant, regardless of any inconvenience occasioned by appellant's assertion of his rights. Patton admitted at the suppression hearing that he had been accurately quoted in a local newspaper on January 3, 1979 as follows:

"According to Patton, Phifer has not been willing to answer questions thus far. Before we ask him any more we are going to let him sweat for a few days...."

See n. 9, *Davis v. North Carolina,* 384 U.S. 737, 748, 86 S.Ct. 1761, 1768, 16 L.Ed.2d 895 (1966) (in which the Court stated, "Further graphic evidence of the obvious purpose of the police in detaining and repeatedly interrogating Davis is

found in statements made to the press during this period..."). Furthermore, at trial Patton testified that it was the policy of his department to obtain a statement from every prisoner. And his deputy, Frank Conner, admitted that the department was actively seeking a statement from appellant from the time he was brought to the jail until the final statement was signed. Patton did not tell the county attorney about the statement of January 9 until several weeks later.

17. See n. 7, *Edwards,* supra, 451 U.S. at 480, 101 S.Ct. at 1882.

18. In the several medical and nonmedical dictionaries we consulted the terms are used synonymously.

victim's neck were adequately proven to be the manner or means of death, as alleged in the indictment in common language as "choking," notwithstanding the eventual cause of death as expressed in technical medical terms.

Appellant's two grounds of error attacking sufficiency of evidence are overruled.

The judgment of conviction is reversed and remanded.