Rose Marie **MONTELONGO**, Appellant,

v.

**The STATE of Texas, Appellee.**

**No. 62539.**

Court of Criminal Appeals of Texas,
In Banc.

Dec. 5, 1984.

James R. Lawrence, Corpus Christi, for appellant.

William B. Mobley, Jr., Dist. Atty. and Eric Brown, Asst. Dist. Atty., Corpus Christi, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

W.C. DAVIS, Judge.

Appellant was convicted of murder.[1] The jury assessed punishment at 99 years' confinement.

Appellant contends the evidence adduced at her trial was insufficient to support the verdict of guilt.

The victim was appellant's four-year-old stepdaughter. Nueces County Medical Examiner Joseph Rupp testified about her injuries and the cause of her death:

> [T]he subject had an extensive injury. Had severe bruising and contusions and was obviously a battered child, had been beaten severely.... [O]n the head area there were lacerations and contusions. There were contusions of the forehead, bridge of the nose, underneath the right eye. There was a laceration of the lip. There were abrasions of the chin and upper portion of the neck. And there was a large superficial abrasion on the left side of the jaw.
>
> And then the other significant injury involved the buttocks area and lower chest and abdomen.... [T]he buttocks were just a mass of confluence, which simply means overlapping and superimposed mass of confluent abrasions and contusions extending all over the gluteal area or back side and the upper part of the legs.... They were recent but not all of identical age.

Q. And could you determine or do you have an opinion as to the age of the oldest wound?

A. Well, its hard to tell exactly, but I would certainly date them from a number of days....

Q. And how are contusions and abrasions normally caused, if you know, Dr. Rupp?

A. A contusion is produced by the application of blunt force. If what you use has any sort of an edge to it, then you may get a laceration overlying it. If it's a relatively flat or blunt object like a fish (sic) or a book or a board or something like that, then you get bruising, rather than any laceration of the skin. And if you—you can then produce a laceration by scraping the superficial surface of the skin away; or if you contuse the skin to a great extent, then you actually mash the skin so that the oils seep out. This is an abrasion, parchment-like type thing, like you see in the pictures, over the buttocks.

Q. Now the parchment-like skin—I will show you now [a photograph of the victim] and ask you whether or not this is the parchment type skin which you're referring to.

A. That's right. This is the most severe area of hemorrhage. This is just as the result of multiple blows with a blunt object, which produce the changes in the skin. And underneath this, produced enough hemorrhage, in association with all the other hemorrhaging and all the other bruises, that the subject bled to death into her skin and muscle and subcutaneous tissue....

Q. [W]hat types of objects could be used?

A. Well, this was produced with a flat blunt object, a hand, a book, a paddle, a board, that sort of thing.

Then if you look at the border areas of these contusions, where they don't overlap and one doesn't flow into another, you can see some linear bruises and abrasions, some little linear bruises, particularly on the lower part of this picture. And this would indicate

---

1. The trial was held in Walker County on a change of venue from Nueces County.

beating with a stick, possibly some round small object, like a stick or that sort of thing....

Q. [D]o you have an opinion as to the number of ... blows that that body underwent to cause [the injuries]? ...

A. That would be very difficult to estimate with any degree of accuracy, but I think we would be safe in saying it would have to be hundreds.

Q. Hundreds?

A. Yes ....

Q. I'll show you [a photograph of the victim's arm] and ask you whether or not, in your opinion, that exhibit reflects what could be called or determined to be a defensive wound.

A. This would be consistent with a defense-type wound, if the subject were attacked with a stick, or a small round blunt object....

Q. I'll show you [a piece of a fishing rod] and ask you if someone used an instrument such as that exhibit on the body of a small child, as it appears in the State's exhibit that you testified to, as to whether or not the injuries reflected in those exhibits would be consistent with having been beaten with an instrument such as [this].

A. Yes. This could have produced some of that injury.

Q. Would you state whether or not these injuries you've discussed or testified to, would be consistent with having been beaten with a belt.

A. With a belt? Yes, quite possibly.

Q. I'll show you [three belts]² and ask you whether or not the injuries sustained by Christine Montelongo would have been consistent with having been beaten by any or all of these exhibits.

A. These instruments could produce this type of injury, yes.

Q. Could the buckle on those exhibits—would the type of buckle be consistent with hitting a small child as reflected in those exhibits.

A. Some of this injury yes, could reflect that. These injuries here on the thigh—these curvalinear, [sic] irregular type things could be consistent with that ....

Q. Do you feel from your experience as a forensic pathologist and by virtue of your examination and your autopsy that there was any way that these wounds could have been self-inflicted by Christine Montelongo?

A. Self-inflicted? Absolutely not. This was a battered child.

Q. [Would the victim's loss of blood] affect her physical condition to the extent that she would possibly fall down or not have as much strength to walk around as a normal child?

A. Yes, that's correct, because the bruises indicate that they occurred over a period of time. Now as the beatings start, the subject begins to lose blood, and then loses more blood and the blood volume goes down and the subject becomes weak ... and giddy and pale ....

Q. [Would the victim's wounds] cause a small child to regurgitate or vomit?

A. Absolutely.

Q. And why would that occur?

A. [B]ecause of this severe trauma. We see this occur many times as people are nearing death .... The body has lost a significant amount of blood volume, is having trouble maintaining its blood pressure .... [W]e have a child who eats a meal ... who can't spare any extra blood going into the gastrointestinal tract to aid her to relate to the problems of the process of digestion. So what does the stomach do? The body, in its wisdom, solves this problem by getting rid of the food.

Q. [W]ould you state whether or not it would be unusual for that child to be unable to hold liquid in its bladder,

2. The belts and fishing rod were seized at the apartment where appellant, her husband and co-actor, and their children had resided.

would it cause it to possibly urinate more so than a normal child?

A. This is part of the overall problem. This child had been beaten to the extent where it is dying and it does not have enough blood volume, and all of these things are likely to happen: having loss of control of its bowels; loss of control of her bladder; stagger around; fall down; acting incoherently. All these things—I would not be surprised that all or any of these things happened over this period of time that the wounds indicate the number of days that these beatings occurred.

Appellant's confession, while not stating with what the victim was hit, comports with the medical examiner's testimony about the duration of the beatings administered the victim; its report of the victim's behavior was in turn corroborated by the symptoms of blood-loss described by Rupp:

On Friday, 5–13–77, Vince came home from work around 4:00 PM. I told Vince about the trouble I had had with Christine not minding me. Vince took Christine into the girl's [sic] bedroom. He first talked to her and then he spanked her. She was allowed to come out of her room, but at supper she wouldn't eat, so she was sent to bed about 8:30 PM. On Saturday, 5–14–77, the girls were up and had eaten breakfast by the time Vince got up. That afternoon while we were having lunch, Christina had refused to eat, she and the other girls eat at a small childs' table. Christina came up and tipped the table over and made a big mess. She then started walking around and had urinated on the carpet. At this, Vince took her into the back bedroom and spanked her. Vince yelled alot. [sic] After this spanking, Christina's bottom started to bleed. On Sunday, 5–15–77, Vince and I had an argument. I went on to church by myself. Vince stayed at home with the kids. I returned from church at approx. 12:30 PM. Christina hadn't slept well the night before, so when I got home, Christina was dozing on the couch. That afternoon Christina was throwing fits. She kept dropping to the floor, acting up. I spanked her several times, but I was too tired, so Vince finished spanking her. Her bottom started to bleed a little. On Monday, 5–16–77, Vince did not go to work. When Christina got up, we noticed she had wet the bed. We got her up and cleaned her off and let her run around without any clothes on. Later on that day I gave Christina a few licks for urinating on the carpet again and later she got another spanking from Vince for not eating her food. Vince was real mad, that's when he hit her with his fist on the rear end. We gave her water and juices because she wouldn't eat her food. On Tuesday, 5–17–77, Christina got up and had breakfast and later had a good lunch. Vince wanted all the girls to go with him to the bank but Christina didn't want to go. She just kept falling to the floor saying she didn't want to go. Vince took Sandra and Priscilla with him and when he came back, he brought Christina an ice-cream sandwich. Christina took the ice-cream after not wanting to and started eating on the paper. Vince took the ice-cream away and I cleaned her face up. Vince took her to the bathroom and told her to use the toilet but she wouldn't. After a while we tried to get her to use our bathroom but again she refused. When she came out she kept falling to the floor. Vince thought Christina was just playing so he spanked her again. I could see something coming out of her nose. I told Vince and he stopped spanking her. He laid her down on a sheet I had lain [sic] down on the floor in our bedroom. I didn't know what to do. I told Vince to give her mouth to mouth but Christina just kept vomiting up something. I tried to call my paster [sic] but I couldn't find him. Vince tried mouth to mouth again but Christina did not respond. I called my sister to come over. When she got there I just told her to take Sandra and Priscilla with her. To take some clothes for the baby and take care of them too.

She asked me what was wrong, but I just told her to leave. I knew she was dead. Vince then called the police.

Other evidence further corroborated the extended and violent nature of the beatings which led to the death of the victim: several pairs of child's panties were found which were stained with blood; flecks of discoloration which appeared to be bloodstains were found on several walls and even on the ceiling of the apartment—sample paint chips from the flecked areas proved to contain blood; extensive bloodstains were found on the toilet seat and bedding used by the victim and her sister; blood was found on at least two of the three belts seized at the apartment and human blood was found on the piece of a fishing rod found in the closet of the master bedroom.

The sister of the victim also testified, stating that she had seen appellant beat the victim with a paddle and with a belt on the day of her death.

■ The jury was charged both upon the theory that appellant was the actor who directly caused the victim's death and upon the law of parties. The evidence was ample to support the verdict under either theory.

The ground of error is overruled.

Appellant also contends the court erred in overruling her motion to suppress her confession, stating that the confession was not given voluntarily, but had been coerced.

■ One reason appellant gives for claiming involuntariness is her testimony that she had been persuaded to sign the statement by a man claiming to be a chaplain who was in fact a police sergeant. The court, as sole judge of the credibility of the witnesses at the *Jackson v. Denno*, 378

U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, hearing, *Vigneault v. State*, 600 S.W.2d 318, 329 (Tex.Cr.App.1980), was entitled to reject that contention, which was disputed by the testimony of police officers,[3] and did so explicitly in its findings of fact.

The court also understandably rejected appellant's twin contentions, to which she testified at the hearing, that she had not read the typewritten statement before signing it and that, having read it, she had requested that certain inculpatory statements be removed—and their removal had been agreed to by police sergeant Alvarado, who had presented the statement to appellant for her signature. Also rejected was appellant's claim, denied by Alvarado, that he had threatened appellant by telling her she would not be transferred to the county jail unless she signed the statement.

■ The penultimate contention with respect to the confession is that, by refusing when first asked to sign the statement, appellant had invoked her right to silence and should not have been subjected to further questioning or requests to sign. Once again, appellant's version was contradicted by the testimony of the police officers involved, who stated that, when appellant had been presented with a typed copy of her statement,[4] she had replied that she was not sure if she wanted to sign it, and that she wanted to do what was right. Alvarado returned about an hour later and asked again whether appellant wanted to sign the statement, and she said she did. The police testimony shows no refusal by appellant to sign the confession and no invocation of her right to silence. It was the court's prerogative to believe the testimony. *Vigneault v. State*, supra.

Finally, although appellant does not directly raise the point and does not rely

**3.** The officers could not state with absolute certainty that no Sergeant Smith had visited with appellant, but he was not among her known visitors, and most of the time she was in the presence of other officers or visitors during the critical period.

**4.** The statement had been made the previous night but not reduced to typing from the long-

hand notes of police Sergeant Lazo until it was too late, in Lazo's judgment, to request that appellant sign it that night. Sergeant Alvarado, who had been busy with appellant's husband and co-defendant during the making of the statement, but who had overall charge of the investigation, presented the typed copy to appellant the next day.

upon *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), as authority, we note that, in her discussion of the contentions discussed, appellant mentions that she was visited by an attorney after she had given her statement, but before she had signed the typewritten copy.

In *Edwards*, supra, the rule is stated that:

> when an accused has invoked [the] right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that [s]he responded to further police-initiated custodial interrogation.... [A]n accused ... having expressed [the] desire to deal with the police only through counsel, is not subject to further interrogation ... until counsel has been made available ... unless the accused [her]self initiates further communication, exchanges, or conversations with the police. 451 U.S. at 484–485, 101 S.Ct. at 1884–1885.

The question suggested by appellant's narrative is whether her discussion with the attorney amounted to an invocation of the right to counsel.

The attorney had been requested to visit appellant, and her husband, by a member of appellant's church. Nothing in the record indicated that appellant desired or requested legal counsel.

The attorney testified that he had told appellant and the police officers that his advice was that she make no further statement, but we hold that, absent some reasonably clear indication from the accused of a wish to adopt such unsolicited advice or to seek further counsel rather than to continue interrogation, the protection against continued interrogation granted to an accused who affirmatively requests counsel pursuant to the rule of *Edwards* does not extend to an accused who receives unsolicited advice at an unrequested meeting with an attorney.

The ground of error is overruled.

Appellant further contends that the court erred in overruling her request that the jury be charged upon the lesser included offenses of aggravated assault and criminally negligent homicide.

Appellant's confession would seem to raise the possibility that appellant acted without knowledge or intent that her acts would lead to the victim's death. The State's contention that there was no evidence that appellant ought to have been aware that a substantial and unjustifiable risk would result from her conduct would, if pursued to its logical conclusion, lead to the inference that no mens rea whatever had been proved, and we do not accept that contention given the evidence referred to ante. But even assuming that appellant would have been entitled to a charge upon criminally negligent homicide as an alternative to murder had murder been the only offense alleged and charged, we must take into account the other offensive theories presented to the jury in the instant case.

Appellant was indicted for murder under two different theories, encompassing violations under V.T.C.A., Penal code, Secs. 19.-02(a)(1) and 19.02(a)(2).[5] The jury was charged upon each of these allegations, both under the theory that appellant was the person who committed the acts alleged, and under the law of parties[6] on the theory that appellant's husband had actually com-

---

5. Sec. 19.02(a) provides in pertinent part:
 A person commits an offense if he:
 (1) intentionally or knowingly causes the death of an individual;
 (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual....

6. V.T.C.A., Penal Code, Sec. 7.01(a) provides:
 A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.
 Sec. 7.02(a)(2) provides that a person is criminally responsible for an offense committed by the conduct of another if:
 acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense....

mitted the acts alleged. The indictment also alleged, under two different theories, that appellant had committed the offense of injury to a child.[7] The jury was charged upon both of these allegations, both upon the theory that appellant herself had caused the injury and upon the theory that she had been a party to her husband's causing them.

The charge requested by appellant upon criminally negligent homicide would have authorized a verdict of guilty of that offense if the jury had found that appellant (whether directly or as a party) caused, by criminal negligence, the death of the victim alleged in the indictment. The charge given the jury authorized a finding of guilty of injury to a child if the jury found that appellant (whether directly or as a party) caused, by criminal negligence, serious bodily injury (which includes death, see V.T.C.A., Penal Code, (Sec. 1.07(a)[34])) to the victim alleged in the indictment, *and that the victim was a child 14 years of age or younger*. The evidence was undisputed in this cause that the victim was a child four years old at the time of her death. If appellant was guilty of criminal negligence in causing the death of the victim, she was perforce guilty of injury to a child. The jury was not left with only the choice of finding her guilty of murder or acquitting her; appellant's interest in permitting the finding of a lesser crime based upon lesser culpability was fully protected by the charge given the jury.

■ Similarly, the requested charge upon aggravated assault was pre-empted by the instruction upon intentional injury to a child, which comprises the same elements with the addition of the *undisputed* element of the age of the victim.

■ We hold, then, that under the facts of this case, where a charge is requested upon a lesser included offense, and a lesser non-included [8] offense authorized by the indictment is charged which differs from the included offense only by the addition of an uncontested element or elements the proof of which is not in dispute, then the lesser *included* offense need not be charged.

■ The grounds of error are overruled.

Appellant further contends that the court erred in permitting the introduction, over objection, of the commission by appellant of an extraneous offense.

The victim's sister testified that appellant had placed her, the sister, in hot water, burning her buttocks. Photographs depicting the burns were admitted, as was testimony by the attending physician describing the wounds and their serious nature.

Appellant's confession could give rise to the inference that appellant's acts toward the children were undertaken to discipline them, and that there was no intent on appellant's part to do serious bodily injury. The burning of the victim's sister provided the jury with strong circumstantial evidence to rebut that inference and to show that appellant did intend to injure. See *Albrecht v. State*, 486 S.W.2d 97, 102–103 (Tex.Cr.App.1972).

The ground of error is overruled.

Appellant also contends the court erred in overruling her motion for mistrial when the prosecutor referred, during the punishment phase, to the fact that her husband was in prison at the time of the trial.

---

**7.** At the time of the offense, V.T.C.A., Penal Code, Sec. 22.04 provided:

(a) A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence engages in conduct that causes serious bodily injury, serious physical or mental deficiency or impairment, or deformity to a child who is 14 years of age or younger.
(b) An offense under this section is a felony of the second degree.
Appellant was alleged to have committed the offense intentionally and knowingly by one count of the indictment; another count alleged commission through criminal negligence.

**8.** In the instant case, even the murder allegations included the (unnecessary) allegations that the victim was a child. That the injury to a child allegations were therefore included within the *actual* (although not the necessary) allegations of murder is not necessary to our decision, however.

We note that no objection was raised until the question of *how long* appellant's husband had been in prison was asked:

Q. Are you saying your husband did all of this and you didn't have anything to do with it?

A. Yes, sir.

Q. Well, why didn't he testify for you if you subpoenaed him?

A. I don't know, sir.

Q. Didn't you subpoena him in this case?

A. I don't know, sir.

Q. Beg your pardon?

A. I don't know.

Q. You don't know.

A. I don't know why he didn't testify. I can't answer that.

Q. Are you still afraid of him?

A. In what sense?

Q. In the sense that you said you were afraid of him, a few minutes ago.

A. How can I be?

Q. What do you mean by that?

A. He's in prison.

Q. Didn't you have occasion to visit with him, since you've been here?

A. Yes, sir.

Q. You weren't afraid of him then.

A. No.

Q. Did you tell him that he had been subpoenaed to testify in this case?

A. No. He already knew.

Q. He already knew?

A. I guess.

Q. Then why didn't he come in here and testify before these people and tell them that he alone beat these little children to death and you didn't have anything to do with it. Why didn't he do that?

A. I don't know, sir. . . .

. . . .

Q. Where did you say your husband was?

A. Sir?

Q. Where did you say your husband is at this time?

A. Prison.

Q. Which way—strike that. Which one? Which unit?

A. Coke Unit.

Q. Is that a unit of the Texas Department of Corrections?

A. Yes, sir.

Q. How long has he been in that prison?

A. MR. LAWRENCE: Your Honor, I'm going to object to this testimony as being completely irrelevant and as being prejudicial.

THE COURT: Sustain the objection.

MR. LAWRENCE: Ask that the jury be instructed to disregard the last question.

THE COURT: As to the last question, the jury is so instructed.

MR. LAWRENCE: We ask for a mistrial.

THE COURT: Deny your motion for mistrial.

MR. LAWRENCE: Note our exception. . . .

. . . .

Q. (By Mr. Mobley) Will you tell us why your husband is in the penitentiary at this time, Mrs. Montelongo.

MR. LAWRENCE: Your Honor, again I'm going to object. He's going back into an area is [sic] highly prejudicial and immaterial in this case.

THE COURT: Mr. Mobley, I'm going to sustain the objection and caution you, sir, that you might be getting us close to a mistrial.

I'm going to sustain the objection and instruct the jury to disregard the question.

MR. LAWRENCE: Your Honor, at this time we would ask for a mistrial.

THE COURT: The Court will deny your Motion for Mistrial, and will once again instruct the jury to disregard the question.

MR. LAWRENCE: Note our exception.

Improper admission of evidence does not constitute reversible error if the same facts were proved by evidence not objected to. *Brasfield v. State,* 600 S.W.2d 288, 296

(Tex.Cr.App.1980). Further, an objection to the introduction of evidence must be urged at the earliest opportunity. We also note that the improper asking of a question can be cured by the court's proper instruction to disregard—an instruction given here twice, and in strong terms, when the State attempted to raise the subject after it had first been broached and abandoned. See *Maddox v. State*, 591 S.W.2d 898, 903–904 (Tex.Cr.App.1979). Finally, we note that, far from being inherently prejudicial to appellant, the fact of her husband's conviction fully comported with her own testimony on punishment that he, and not she, had been solely responsible for the beatings administered to the victim and her sister.

The ground of error is overruled.

 Appellant also contends that "the court erred in not granting a mistrial when heresay [sic] testimony was heard by the jury." Appellant refers to the testimony of Charles Conklin, the physician who treated the victim's sister for second and third degree burns to her buttocks:

Q. And were you able to determine any type of a history upon your examination, from your questioning of Sandra, which would indicate how she received these injuries?

A. We felt like we found out what caused the burns.

Q. Did—are these burns or injuries—are any of those wounds consistent with being hit with a hand or a belt or any type of fishing rod?

A. No, sir.

Q. And how did she tell you she received those particular injuries?

A. She—

MR. LAWRENCE: Your Honor, I'm going to object to any hearsay testimony as to what Sandra may have said.

THE COURT: Sustain the objection.

Q. (By Mr. Mobley) From your investigation, from her history given, would you just state whether or not you were able to determine how the injuries occurred.

A. Yes, sir.

Q. And how did it occur from the history you were given?

MR. LAWRENCE: Your Honor, I'm going to object—

THE COURT: That's the same question, Mr. Mobley. Sustain the objection....

....

Q. And will you state whether or not, Dr. Conklin, that these injuries which you've described are consistent with a person being placed in boiling hot water.

MR. LAWRENCE: Your Honor, I'm going to object to that. We're getting back to —

THE COURT: Sustain the objection.

MR. LAWRENCE: We would ask that the jury be instructed to disregard it.

THE COURT: The jury is instructed to disregard.

MR. LAWRENCE: We would ask for a mistrial at this time.

THE COURT: Overrule and deny your motion for mistrial.

MR. LAWRENCE: Note our exception.

MR. MOBLEY: Before I ask any further question, Your Honor, may I have permission to approach the Bench?

THE COURT: Yes.

(The following discussion was held at the Bench out of the hearing of the jury:)

MR. MOBLEY: I'm sorry. I thought he could say that. This is a doctor. He could state what his treatment would be consistent with.

MR. LAWRENCE: The doctor testified on the other hearing—Never mind. I don't want to open the door.

We note that the sister later testified that she had been placed in hot water. The doctor's expert opinion that such treatment would have been consistent with the wounds would have been admissible as expert opinion. That the court, in an abundance of caution, chose not to admit such evidence—at least before it had been linked

up with non-hearsay testimony that the incident had in fact occurred—does not vitiate the non-hearsay nature of the evidence called for by the prosecutor's last question. That he had earlier twice called for hearsay testimony on the same subject is of no moment, for each time appellant was granted all the relief requested. *Reese v. State,* 531 S.W.2d 638 (Tex.Cr.App.1976); *Hopkins v. State,* 480 S.W.2d 212 (Tex.Cr.App. 1972).

The ground of error is overruled.

 Appellant contends finally that the court erred in admitting the fruits of the search of appellant's residence and the consent form signed by appellant prior to the search.

Appellant's contention is based upon the assertion that her testimony—that she neither read the consent form nor had it read to her before signing it, and that its contents were never made known to her, but she was simply told it was to be signed—was uncontradicted. It is true, as appellant asserts, that no evidence was offered to contradict that testimony at the hearing held outside the presence of the jury when appellant for the first time announced that the consent would be contested. It is also true, however, as the State asserts, that Alvarado had already testified before the jury to a version of the events which contradicted each of appellant's assertions. Upon this issue, as upon the issue of voluntariness of the confession, the court was the sole judge of the credibility of the witnesses. *Vigneault v. State,* supra. There was ample evidence to support the court's conclusion that the permission to search was voluntarily given.

The ground of error is overruled.

The judgment is affirmed.

CLINTON, J., concurs in the result.

TEAGUE, Judge, dissenting.

There are two main issues in this case regarding the admissibility of the written confession of Rose Marie Montelongo, appellant, namely: (1) Did appellant invoke her right to have the assistance of counsel prior to giving the written confession, and (2) did the State establish that she waived her right to counsel, after she invoked her right to counsel, if she did?

The majority holds: "[A]bsent some reasonably clear indication from the accused of a wish to adopt such unsolicited advice or to seek further counsel rather than to continue interrogation, the protection against continued interrogation granted to the rule of Edwards does not extend to an accused who receives unsolicited advice at an unrequested meeting with an attorney." I disagree.

Where an accused has been given the opportunity to consult with an attorney, and does so, in the face of non-rejection of the attorney, does this constitute an implicit invocation of the right to counsel? I believe it does.

In *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the United States Supreme Court held in part that "an accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Also see *Phifer v. State,* 651 S.W.2d 774 (Tex.Cr.App.1983); *Coleman v. State,* 646 S.W.2d 937 (Tex.Cr.App.1983); *Wilkerson v. State,* 657 S.W.2d 784 (Tex. Cr.App.1983).

To hold that appellant did not in this instance invoke her right to counsel actually ignores what happened in this cause, and exhibits a total ignorance of the real world that exists beyond the summit where this Court's members are stationed. See, however, the paper entitled "The Midnight Phone Call—What To Do Next?," by Polland and Robertson, delivered at a criminal law institute sponsored by the State Bar which was held in Dallas in September, 1982, and the paper entitled "The crucial First Steps—Initial Contact, Immediate Action, Deciding whether To Take The Case," by Forche, delivered at another State Bar

sponsored criminal law institute held in Harlingen in March, 1977.

The facts that relate to the taking of appellant's confession reflect that on May 17, 1977, appellant and her husband, Vicente, see *Montelongo v. State*, 644 S.W.2d 710 (Tex.Cr.App.1983), were arrested and charged with committing the murder of Christine Montelongo, Vicente's daughter. They were booked into the Corpus Christi police station jail.

The record reflects that Gilbert R. Lazo and U.B. Alvarado were Corpus Christi police officers assigned to work the case against appellant and her husband. After arrest, appellant gave Lazo an oral confession, who wrote the confession in long hand, and thereafter left appellant's presence to take what he had written down to a police typist in order to have the oral confession converted into a typed confession, which occurred. However, notwithstanding that Lazo then had a typed confession, that only needed appellant's signature on it to make it a valid confession, he never returned to where appellant was then situated in the jail. This, of course, does not make any sense until one considers what happened between the time Lazo left appellant's presence to go to the police typist and before he could get back to appellant with the typed confession.

The transcription of a pretrial hearing reflects that on the same day, Clyde Jackson, a licensed attorney at law, went to the Corpus Christi police station to visit appellant and her husband. Jackson went there at the behest of Eugene Seaman, who appears by the record of appeal to have been a member of the same church that appellant and her husband had attended. At the police station, Jackson came into contact with both Lazo and Alvarado. For reasons not clearly reflected by the record, Jackson told them he was not then representing appellant.

Jackson met, consulted with, and counseled appellant, after which he told her "that I would have to get someone else to represent her '[because I had at that time a lot of other cases going, and I just didn't feel that I could handle the case].' But I told her that she should not sign any statement till the next day, so that I could get an attorney to represent her." Jackson then left appellant's presence after which he again came into contact with Lazo and Alvarado. Jackson testified that "Seems like I had asked them had she signed a statement and they said she hadn't. I think after I got through with them, I told them that I didn't think she ought to sign a statement that night or some words to that effect." Jackson also testified that the reason he made these statements to Lazo and Alvarado was "to protect her rights until she could get the advice of an attorney that was [sic] representing her."

Alvarado testified that Jackson's statements meant nothing to him because "I would have gone up there and interviewed her anyway. I would wait for the Defendant to tell me himself or herself that she specifically did not want to have anything to do with me, or whatever. [If that occurred,] I would have terminated the interview."

Notwithstanding Alvarado's statement, and further notwithstanding the fact that by that time Lazo had had the oral confession reduced to writing, no efforts were made at that time, either by Lazo or Alvarado, to get appellant to sign the typed confession.

But all of this was to change the next morning. Alvarado testified that after he came to work the next morning he found appellant's unsigned typed statement in the case file. He then took it to where appellant was situated in the jail. When Alvarado asked appellant if she wanted to sign the confession, she responded "that she wasn't sure; that she wanted to do what was right." Alvarado "then told her to go ahead and think about it, and I left her there for awhile." In approximately one hour, Alvarado returned, after which appellant signed the confession.

Did appellant invoke her right to have the assistance of counsel? The majority answers the question in the negative. I disagree.

First, I do not believe that anyone could deny that appellant and Jackson established the attorney-client relationship. See Vol. 7 *Tex.Jur.3rd*, Sec. 49, at page 391. The record clearly reflects that Jackson's visit with appellant occurred solely and only because he was a licensed attorney at law. Although the record does not reflect just exactly how long Jackson visited appellant, it is safe to assume that he spent a reasonable period of time with her. I believe that the majority's characterizing Jackson's visit with appellant as amounting to nothing more than her receiving "unsolicited advice" exhibits a lack of understanding of the role that an attorney at law plays in our present day society when he is summoned to the jail house to consult with an accused person.

I believe that at a minimum, when an accused does not reject the services of a licensed attorney, and receives from him advice and consultation, the accused has implicitly invoked his right to the assistance of counsel. This is conduct which manifests itself with an intent to deal with the police only with the assistance of counsel. My research has yet to reveal where any court has ever held that an accused person's invocation of the right to the assistance of counsel must be expressed, as the majority implies, rather than implied, as here.

Because it was established that appellant invoked her right to the assistance of counsel, it was then incumbent upon the prosecution to demonstrate and establish, if it could, that appellant affirmatively waived her right to the assistance of counsel. In this, the prosecution failed. See *Wilkerson v. State*, supra. Also see *Griffin v. State*, 665 S.W.2d 762 (Tex.Cr.App.1983).

To the majority's holding that appellant never invoked her right to the assistance of counsel, I respectfully dissent.