**Jeffery Lee GRIFFIN, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 68924.

Court of Criminal Appeals of Texas, En Banc.

May 25, 1983.
Rehearing Denied Sept. 21, 1983.
Certiorari Denied Feb. 21, 1984.
See 104 S.Ct. 1327.

Stanley G. Schneider, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Winston E. Cochran, Jr., Kay Burkhalter and Wil-

liam E. Taylor, III, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION

ODOM, Judge.

This is an appeal from a conviction for capital murder. After the jury answered affirmatively the issues submitted under Art. 37.071, V.A.C.C.P., punishment was fixed at death.

Appellant raises twenty five grounds of error, but they are grouped for argument into five distinct issues.

 The first twelve grounds of error raise a single issue, one with respect to each person selected to serve on the jury. Each ground of error asserts

"The District Court committed reversible error when it compelled Juror [named juror] to swear that the mandatory penalty of death or life imprisonment would not affect his deliberations on any fact issue."

We initially note that while these grounds of error challenge use of V.T.C.A., Penal Code Sec. 12.31(b), they do not assert erroneous exclusion of a juror under that section, as was the case in *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581. To the contrary, appellant seems to assert that any use of Sec. 12.31(b) is constitutional error. *Adams,* supra, recognized that Sec. 12.31(b) may be used in a constitutional manner, and we perceive no error in the use made during selection of the jurors who served in appellant's case. Representative of the inquiry made of each juror in this case by the trial court is the following example:

"THE COURT: Let me go back into something that has already been gone into. I want to ask you this and then I will let the other attorney ask you some questions.

"You have been told now that the Defendant in this case is charged with an offense which is a capital felony, the offense being capital murder.

"Now, on conviction, assuming there is a conviction, on conviction for a capital felony, a sentence of death or life imprisonment is mandatory, one or the other.

"If you were selected as a juror in this case, it will be your duty not to let that mandatory penalty for death or life imprisonment affect your deliberations on any issue of fact.

"Can you and will you perform your duty if you are selected as a juror in this case?

"THE WITNESS: I will.

"THE COURT: And can you carry out and follow your oath as a juror, if selected as a juror in this case?

"THE WITNESS: I can."

In any event, no objection was made at trial so nothing is presented for review. Cf. *Battie v. State,* 551 S.W.2d 401 (Tex.Cr. App.1977); *May v. State,* 618 S.W.2d 333 (Tex.Cr.App.1981). The first twelve grounds of error are overruled.

 The next ground of error asserts improper exclusion of a prospective juror contrary to *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776. Examination of this prospective juror occupies approximately fifty pages of the record. Early in the examination she indicated she was "moderately" opposed to the death penalty. In the course of a few pages she expressed conflicting positions:

"Q. Are you saying you are for the death penalty or against the death penalty?

"A. Well, I guess it really would depend.

"Q. Okay. Are you basically for people being put to death, or basically against people being put to death?

"A. I guess for.

"Q. You believe in the death penalty?

"A. Yes.

"Q. Okay. Can you tell me why you believe in the death penalty? What would be the reason that you would

write down, on a piece of paper, if we gave you an essay and said: Tell us why you believe in the death penalty, or why you don't. What would your answer be? Got any ideas?

"A. No.

"Q. Okay. I think you had better ideas or you felt more strongly against the death penalty, because you said you don't believe a person should take another person's life.

"Is that true?

"A. (Witness indicates.)

"Q. Is your answer yes?

"A. Yes.

"Q. There's not a button on there for a nod.

"I think you felt more strongly against the death penalty, because of the Bible which says: Thou shalt not kill. Would that be a fair statement?

"A. Yes.

"Q. Okay. Would it be a fair statement then that you do have feelings or principles against the death penalty?

"A. Yes.

"Q. All right. My question to you then is: Because of those feelings, would you, if you had to make a choice between life or death for punishment, would you automatically vote against the death penalty, even if you thought it was a proper case?

"A. Yes.

"Q. Is that because you don't want to send someone to death?

"A. Yes."

After explaining the punishment stage issues to the prospective juror, she was examined further on the matter of her opposition to the death penalty:

"Now, my question to you is: Even if I showed you facts, I proved to you beyond a reasonable doubt that the man deliberately committed the offense, he deliberately killed the man, and I proved to you it was probable that he was going to commit acts of violence in the future, because last year he killed somebody else, and the year before that, he had done another robbery, if you believed both of those questions to be yes beyond a reasonable doubt, would you still answer them no because of your personal feelings against the death penalty?

"A. Yes.

"Q. What is your answer to that question?

"A. Yes.

"Q. Okay. So no matter what evidence I showed you, no matter how horrible the crime, how many people had been murdered, you would still answer no so that he could receive life instead of death; is that true?

"I'm just making sure I'm understanding you correctly.

"Is that what you are saying?

"A. Yes."

Subsequently defense counsel examined her and she acknowledged the conflicting statements of her position that she had given:

"Q. You told us, at first, you don't believe in the death penalty.

"That's what you said; right?

"A. Uh-huh.

"Q. And you told us that feeling you have is not a real strong feeling, but a moderate feeling; is that correct?

"A. Yes.

"Q. Then, you told Miss Burkhalter that you did believe in the death penalty.

"A. Uh-huh.

"Q. I believe you told her that in response to a question that: Could you do it, in a proper case?

"A. Uh-huh.

"Q. Could you vote for the death penalty in a proper case if you were convinced beyond a reasonable doubt, as a juror, that the person deserved the death penalty?

"A. Well, I guess it would depend like on how many people he killed, you know, and what he did.

"Q. Let's say he killed three people, a real vicious way.

"A. Yes, I probably would, you know.

"THE COURT: Talk a little louder.

QUESTIONS BY MR. PIZZITOLA CONTINUED:

"Q. Let me say this to you now, Miss Jackson,—

"A. Uh-huh.

"Q. Do you see Jeffrey Lee Griffin sitting over there?

"A. Yes.

"Q. Okay. He is charged with a crime here today.

"A. Uh-huh.

"Q. But you're answering these questions—you're not answering them as they relate to Jeffrey Lee Griffin. See, we are not saying: Would you not put him to death, or would you put Jeffrey Lee Griffin to death. That's not the issue here.

"The question is: In just any case, what your general feelings are.

"I believe you told me that it would depend on maybe how many murders occurred.

"A. Uh-huh.

"Q. We can't tell you what the facts of Jeffrey Lee Griffin's case is, but in general, you could consider the death penalty, in a proper case; is that correct?

"A. Yes.

"Q. You could vote and answer the questions yes, if you believed in your heart, if you were convinced, as a juror, beyond a reasonable doubt that they should be answered yes, could you answer them yes?

"A. Yes.

"Q. And knowing the results of your answers, you could still answer those questions the way you believed they should be answered?

"A. Yes."

The court attempted to clarify the prospective juror's position, but without success:

"Say you have sat there and you have heard all this evidence, and you found the Defendant guilty beyond a reasonable doubt.

"You have heard more evidence concerning the penalty, and you say to yourself: The State has proved to me beyond a reasonable doubt that each of those questions must be answered yes.

"Now, can you answer those questions yes, if it has been proved to you beyond a reasonable doubt that the answer is yes? Could you answer them both yes, knowing if you did that, the Judge would have to assess the death penalty?

"Could you do that?

"THE WITNESS: I guess it would depend.

"THE COURT: Ma'am?

"THE WITNESS: I guess it would depend.

"THE COURT: What would it depend on?

"THE WITNESS: (No answer.)

"THE COURT: Would you answer those questions no, even though the evidence required you to answer them yes?

"I don't care what your answer is.

"THE WITNESS: It might.

"THE COURT: I couldn't care less.

"THE WITNESS: It might, you know.

"THE COURT: We have got to get something a little bit more definite than that. We really do, because if the State goes through all the trial, goes through all the trial, and you found the man guilty beyond a reasonable doubt—we can't tell the facts now. No way. We are not permitted to. But we have to know whether or not you could follow the law, or whether, because of your personal feelings, even though the law says one thing, whether you would be unable to follow the law, because of your personal feelings, personal scruples, and we have to know that, both the State and the defense, you see.

"We don't care what your answer is. There are no right or wrong answers. We just want to know the truth, and if the State proves to you beyond a reasonable doubt that both those questions should be answered yes, of course, they are entitled to have a juror that could say yes, but if you can't say yes and they should be answered yes, and you cannot say yes, because you are strongly against the death penalty, we want to

know that, whether or not you could follow the law.

"THE WITNESS: (No answer.)

"THE COURT: Do you know whether or not you could answer those questions yes, if the evidence requires the answer to be yes?

"THE WITNESS: No.

"THE COURT: No, you don't know if you could answer the questions, or no, you can't do it?

"I don't care what your answer is.

"THE WITNESS: I don't know if I could answer it yes.

"THE COURT: You just don't know at this time?

"THE WITNESS: No.

"THE COURT: Go ahead and ask her some questions, Counsel."

Finally, however, her position solidified to a commitment to vote against the death penalty no matter what the facts showed:

"Q. Okay. Are you saying that your basic feeling is that you are against the death penalty?

"A. Yes.

"Q. Are you saying that no matter what facts I prove to you, that no matter how horrible, that because of your personal scruples that you will vote against the death penalty?

"A. Yes.

"Q. Even if you thought it was a proper case, would you vote against the death penalty because of your personal feelings?

"A. Yes.

"Q. Okay. Are you telling me that you are automatically going to answer no to Questions 1 and 2 because that would result in a life sentence instead of the death sentence?

"A. Yes.

"Q. Okay. We are just trying to be clear, and I'm not trying to confuse you, and I think I understand what you're saying.

"Is there anything I can do to change your mind on that?

"A. No.

"Q. Okay. Then, I think you are clear that you are against the death penalty, and you would vote against it no matter what the facts are, and I don't disagree with that, and I have no further questions.

"THE COURT: You have said now that regardless of what the facts are in any case might show, that you would never assess death as a punishment for crime or participate in a verdict that would result in assessment of death as a punishment for crime; is that correct?

"THE WITNESS: Yes.

"THE COURT: And you know if you were selected to serve as a juror in this case, you would have a duty to not let the mandatory penalty of death or life affect your deliberations on any issue of fact in the case.

"Now are you telling the Judge now that because of your feelings on the death penalty that the mandatory penalty for death or life would affect your deliberations in this case? Is that what you are telling me, because of your feelings as to the death penalty, the mandatory penalty for death or life imprisonment would affect your deliberations in this case?

"Is that what you are telling me?

"THE WITNESS: Yes.

"THE COURT: You are telling me that you cannot follow your oath, if you took an oath for a true verdict to render in accordance with the law and the evidence in the case. Are you telling the Judge and the Court and all these lawyers and parties here that you could not follow that oath, because of your feelings against the death penalty?

"Are you telling me that?

"THE WITNESS: Yes.

"THE COURT: And again, you're saying that even if the State proves to you beyond a reasonable doubt that each of the two questions that have been gone into thoroughly with you concerning the penalty phase of the trial, if each of those two questions should be answered yes, that you would not answer those

questions yes under any circumstances whatsoever, if they would result in the death penalty?

"Is that what you're telling me?

"THE WITNESS: Yes.

"THE COURT: Even though you should answer yes, you would answer no so the death penalty would not have to be assessed by the Judge.

"Is that what you're telling me?

"THE WITNESS: Yes.

"THE COURT: If you would like to ask her some questions, go ahead, Mr. Pizzitola.

RECROSS EXAMINATION

QUESTIONS BY MR. PIZZITOLA:

"Q. Miss Jackson, if you heard testimony about two different murders—

"MR. TAYLOR: Judge, I object to that. That's an improper question. We are talking about capital murder theoretically and not about—

"THE COURT: I'll sustain the objection.

"Go ahead, Counsel.

"MR. PIZZITOLA: Note my exception, Your Honor.

"THE COURT: Yes, sir.

QUESTIONS BY MR. PIZZITOLA CONTINUED:

"Q. Miss Jackson, if you have heard testimony, you are saying regardless of the facts, Miss Jackson, that you would always answer at least one of those no, or is there a fact situation where you could follow the oath and answer both of them yes, even though it would mean the death penalty?

"A. I would probably answer no.

"Q. You would probably answer no.

"A. To one of the questions.

"Q. Would you always answer no regardless of the facts, even if you believed they should be answered yes and you were convinced of that from the evidence?

"A. Yes.

"THE COURT: What was your answer, ma'am?

"THE WITNESS: Yes.

"THE COURT: Yes, you would always answer no; is that what your answer is?

"THE WITNESS: Yes.

"MR. PIZZITOLA: That's all my questions.

"MISS BURKHALTER: The State would move to challenge, Your Honor.

"MR. PIZZITOLA: I would object to that challenge, Your Honor.

"THE COURT: The challenge is hereby granted."

The record supports the trial court's ruling that this individual was subject to challenge for cause. See *Porter v. State*, 623 S.W.2d 374 (Tex.Cr.App.1981); *Bass v. State*, 622 S.W.2d 101 (Tex.Cr.App.1981); *Williams v. State*, 622 S.W.2d 116 (Tex.Cr. App.1981). No *Witherspoon* error is presented. The ground of error is overruled.

█ We come next to a group of seven grounds of error challenging admission of confessions and a knife (the murder weapon) recovered as a result of a confession. The core of appellant's position is that the confessions were the product of interrogation conducted after he had requested counsel and the police had refused to provide counsel. He relies on *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, in his argument under these grounds of error. After appellant had been warned by a magistrate, he was cautioned by officer Bostock, who gave the following testimony during the hearing on the motion to suppress:

"A. He was returned to the interview room in the Homicide Division, and we again went over his legal rights to make sure he understood them, sir.

"A. How did you do that? Did you take the warnings from a card? Did you take them from a confession form?

"A. We used the same warning the magistrate did, sir, and went over each point.

"Q. So you read the one that is in State's Exhibit No. 6; is that right?

"A. Yes, sir, it is.

"Q. Did you question him as to whether or not he understood what each one of these rights meant.

"A. Yes, sir, we did.

"Q. Did you tell him that he had a right to employ a lawyer, as reflected in there?

"A. We did, sir, and he said he had a lawyer.

"Q. Did you ask him whether or not he knew he had a right to remain silent?

"A. Yes, sir, we did.

"Q. Did he understand that?

"A. Yes, sir, he did.

"Q. Did you tell him that he had a right to have a court appointed lawyer, if he couldn't afford a lawyer?

"A. Yes, sir, we did.

"Q. Did he understand that concept?

"A. Yes, sir, he replied he had a lawyer.

"Q. He didn't want a court appointed lawyer, as far as you could tell?

"A. He didn't want any lawyer, sir.

"Q. Did you tell him that if he elected not to remain silent, that what he said would be taken down and probably used against him?

"A. Yes, sir, we did.

"Q. Is that reflected on the warning that we are talking about?

"A. Yes, sir.

"Q. Did he say he understood that?

"A. Yes, sir, he did.

"Q. Did he say at that point and time that he wanted to talk to you?

"A. We asked him if he wished to talk to us, after all of this, and he said: Yes, I'll talk to you.

"Q. Did he talk to you freely and voluntarily?

"A. Yes, sir, he did.

"Q. How long did you talk to him while he was there in the interrogation room?

"A. He talked to us until around 3:00 o'clock.

"Q. So this would be from 2:00 o'clock to 3:00 o'clock?

"A. Probably about 1:45 to about 3:00 o'clock, yes, sir.

"Q. What were you talking about then? Were you talking about the previous statement or what?

"A. We talked about the previous statement and some of his background, some of his way of life and so forth, where he lived, about the investigation itself, and then about 3:00 o'clock that afternoon, he looked at us and said: I think I want to talk to my lawyer.

"Q. What did you do then?

"A. I asked him who his attorney was and he said it was Mr. Jennings.

"I pulled out a telephone book, looked up the number, dialed the number, gave him the telephone.

"Q. Is that Tom Jennings?

"A. I believe that's his first name, yes, sir.

"Q. Is that the person you dialed, in any event?

"A. Yes, sir. I called his office at which time I gave Mr. Griffin the telephone, and Detective Schultz and I stepped out of the office.

"Q. What happened then?

"A. He talked on the telephone, sir. We didn't listen to the conversation. We left the door open where we could observe him, but we did not listen to the conversation.

"Q. How long did the conversation take place?

"A. Roughly between five and ten minutes, I believe, sir.

"Q. This would have been sometime after 3:00 o'clock, between 3:00 o'clock—

"A. It was right around 3:00 o'clock when he stated that he would like to talk to his lawyer, that he had better talk to his lawyer, and then, after he hung up, we returned in there, and he advised us that he had, in fact, talked to his attorney, and about 3:30, his attorney called back and asked to talk to him.

"Again, we put him on the telephone and we left the office.

"Q. Between 3:00 and 3:30, did you talk to him about the case?

"A. We talked to Mr. Griffin mostly, I think, about what his attorney was advising him.

"Q. Okay. Then, at 3:30, Mr. Tom Jennings again called the Homicide Office?

"A. Well, Detective Schultz was advised that Mr. Jennings was on the telephone, and then Detective Schultz came back into the interview room and told Mr. Griffin that his attorney wanted to talk to him.

"We again left the interview room and allowed him to talk to Mr. Jennings on the telephone.

"Q. How long did that conversation take?

"A. Just a short conversation, just a minute or two, I believe.

"Q. What happened after he hung up?

"A. We re-entered the interview room and asked him what had happened, and he said Mr. Jennings had told him he was not going to represent him.

"Q. Did you ask him then whether he wanted a lawyer?

"A. Yes, sir. We asked him if he wanted to call another lawyer.

"Q. What did he say?

"A. He said: No. He just didn't want to talk to any lawyers right now.

"Q. Who was present when this was said?

"A. Detective Schultz and I believe Detective Kent had come in by that time, and I don't recall if there was anybody else actually in the room then, sir.

"Q. But, in any event, he said he didn't want any lawyer?

"A. He said he didn't want any other lawyer now.

"Q. Then what happened?

"A. Detective Kent asked me if— When Detective Kent came into the room, he was behind me, and Mr. Griffin smiled at him.

"Detective Kent asked me if I would have any objections if he interviewed him, and I stated: No, and I leaned over and told Detective Schultz that Detective Kent wished to interview him, and Detective Schultz and I stepped out of the room, sir."

These facts contrast sharply with those of *Edwards v. Arizona,* supra, upon which appellant relies. Appellant did not make a general request for counsel, as Edwards did. Appellant did not say he did not want to talk to the officers, as Edwards did. Appellant did not say he wanted to deal with the police only through counsel, as Edwards did. Appellant's request to consult with his attorney was promptly and fully honored, as Edwards' was not. Appellant was even asked by the officers if he wanted to talk to another lawyer after his previous lawyer declined representation, and appellant explicitly stated he did *not* want to talk to any lawyer at that time, expressly declining to exercise the right he now asserts was denied him. We find *Edwards v. Arizona,* supra, is clearly distinguishable and overrule these grounds of error.

In his next two grounds of error appellant relies on *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359, in his attack on the testimony of two witnesses, a psychiatrist and a clinical psychologist, called by the State *on rebuttal after the defense presented the testimony of a psychiatrist at the punishment stage* of the trial. We find these circumstances under which the testimony was presented by the State is different from those addressed in the *Smith* case. In its decision the Supreme Court expressly stated:

"A criminal defendant, who neither initiates a psychiatric evaluation *nor attempts to introduce any psychiatric evidence,* may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." (Emphasis added.) 451 U.S. at 468, 101 S.Ct. at 1876.

*Smith* does not apply. The grounds of error are overruled.

■ The last three grounds of error complain of admission of the shirts worn by the two murder victims. Appellant argues

they were admitted solely to inflame the jury, contrary to the statement in footnote 1 of *Bradford v. State*, 608 S.W.2d 918 (Tex.Cr.App.1980). That case expressly overruled the requirement that bloody clothing must solve some undisputed fact issue before it is admissible. Here the shirts were used to demonstrate the number of stab wounds suffered by the victims, thereby tending to show the location of the wounds, reflecting an intent to kill. It cannot be said the exhibits were offered *solely* to inflame the jury. Furthermore, it is doubtful that timely objection was made. The witness displayed the exhibits before the jury and described them for over three pages before objection was made at the time they were formally offered. The grounds of error are overruled.

The judgment is affirmed.

ONION, Presiding Judge, dissenting.

In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the United States Supreme Court wrote:

"... [a]lthough we have held that after initially being advised of his Miranda rights, the accused may himself validly waive his rights and respond to interrogation, see *North Carolina v. Butler*, supra, [441 U.S. 369] at 372–376, 60 L.Ed.2d 286, 99 S.Ct. 1755 [at 1756–59] the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or

conversations with the police." (Citation omitted.)

In the instant case the record shows the appellant asked to talk to his attorney. He conversed over the telephone with attorney Jennings for five or ten minutes. Upon subsequent inquiry by the police officers he told them he had talked with his attorney. Shortly thereafter attorney Jennings called back and talked to the appellant. After the telephone conversation terminated, the police officers re-entered the interview room and asked what happened. When informed by appellant attorney Jennings was not going to represent him, he was asked by the police officers if he wanted to call another lawyer. His response, according to the State's testimony, was that he "just didn't want to talk to any lawyers right now." Thereafter, Detective Kent came into the room and asked to interview the appellant. The other officers left and the confession followed.

It is clear from the testimony quoted by the majority that having exercised his right to counsel, appellant did not initiate further communication, exchanges, or conversation with the police. After his conversations with attorney Jennings, appellant supposedly said he did not want to talk to any lawyer "right now," but he did not say that he wanted to talk to the police. It was the police who continued to initiate the conversation about the offense.

This case cannot be squared with *Edwards v. Arizona*, supra.

I vigorously dissent to the court's disposition of the grounds of error relating to the admission of the confession.

CLINTON, TEAGUE and MILLER, JJ., join in this opinion.