**Paul Barry BUSH, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69076.**

Court of Criminal Appeals of Texas, En Banc.

July 24, 1985.

Rehearing Denied Oct. 23, 1985.

Floyd D. Holder, Jr., court appointed, Lubbock, for appellant.

Guy Hardin, Dist. Atty., Pampa, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Judge.

This is an appeal from a conviction for capital murder. Punishment was assessed at death. Appellant was previously convicted of this offense. However, this Court reversed that conviction in *Bush v. State,*

628 S.W.2d 441 (Tex.Cr.App.1982), because of the erroneous admission of evidence concerning an extraneous offense. After a new trial, the case is now before us again. Because of trial error in admitting evidence of an oral statement made by appellant, we are compelled to again reverse appellant's conviction. However, before we address that particular ground of error we will address a ground of error appellant raises concerning the sufficiency of the evidence.

In his second ground of error, appellant argues that the evidence was insufficient to support an affirmative answer to the second punishment issue, that is, whether there is a probability that he will commit criminal acts of violence that would constitute a continuing threat to society.

At the punishment stage of the trial the State introduced the testimony of two law enforcement officers from Potter County. Sheriff T.L. Baker and Deputy Jim Hands both testified that appellant's reputation in the community for being a peaceful and law-abiding citizen was bad. The State then introduced into evidence a letter written by appellant while on Death Row after his first conviction for this offense. This letter was written to another T.D.C. inmate and in it appellant offered to pay the inmate $20,000.00 if he would kill the individuals who had testified against appellant at his first trial. The State then rested.

Appellant then introduced the testimony of two psychologists. Dr. Richard Wall testified that he examined appellant on June 23, 1982, and found him to have an immature personality and to be a big talker but also very nonconfrontive. When the letter written by appellant to the T.D.C. inmate was shown to Dr. Wall, he testified that it was a good example of appellant's "king of the world, controller of lives" attitude. He again reiterated, however, that if appellant was in a confrontation, he would remain passive. Finally, Dr. Wall testified that it was very difficult to predict future dangerousness and probably no better than one in three predictions was accurate.

Dr. Wendell L. Dickerson, formerly Chief of Mental Health Services with T.D.C., testified that in his professional opinion, the accuracy of predictions of future dangerousness was wrong two out of three times.

The State offered no psychiatric or psychological expert testimony either during their case in chief or on rebuttal.

■ This Court has recognized that evidence presented at the guilt stage of the trial may be considered by the jury when determining the second punishment issue, and the circumstances of the offense, if severe enough, may alone be sufficient to support an affirmative answer by the jury on that issue. *Roney v. State*, 632 S.W.2d 598 (Tex.Cr.App.1982). We have read the record from the guilt-innocence phase of the trial and find that the facts adduced therein furnish great probative evidence in support of the jury's affirmative finding as to the second special issue.

Viewing the evidence in the light most favorable to the verdict, we find that the evidence adduced at the guilt stage of the trial showed that while appellant was burglarizing Ladd's Pharmacy in Canadian for drugs, Deputy M.L. Guthrie responded to the silent alarm that appellant had triggered. As Guthrie pulled his car up to the front of the drug store, but before he could even turn the ignition off, appellant, who was still inside the drug store, fired a blast from his shotgun. This blast went through the front windshield of Deputy Guthrie's car. Appellant then exited the pharmacy, leaned over the hood of Guthrie's car and fired another blast through the front windshield. Appellant then climbed over the front of the car which was wedged up against the front of the store, went around to the open front door on the driver's side of Guthrie's car, stuck his shotgun through the opening and shot Guthrie again at point blank range, while the deputy was pleading for help over his radio.

Sheriff C.H. Wright, who was the first one to reach the scene after the shooting, testified that Guthrie was found leaning over in the front seat of his car, bleeding badly. Guthrie had several wounds on his face and a large wound under his left arm.

The car's engine was still running, Guthrie's pistol was holstered and the strap over his gun had not been unsnapped.

Larry King testified that appellant began staying with him in the early part of July of 1980. Shortly thereafter, appellant asked King if he would drive him to Canadian to "rob a drug store of Preludin." King replied that he did not want to be involved. On the evening of July 12 appellant borrowed King's car on the pretext of going to see a girl. Appellant did not return until 6:30 the next morning. When King began questioning him as to where he had gone, appellant told King that he had "killed a cop" in Canadian. King also related how, prior to July 12, appellant had gotten his 12-gauge shotgun repaired and bought ammunition for it. After he had been informed of the killing, King drove appellant to Dumas so that he could stay with someone else and, during the trip, appellant threatened to kill everyone who knew about his role in the burglary. At one point during their trip when King asked appellant if he was bothered by what he had done, appellant replied, "Hell, no. It's just like killing a rabbit."

Larry Austin, an acquaintance of appellant's, testified that the day after the murder, appellant came to his house and asked if he could stay there for awhile. Appellant bragged to Austin about killing the officer in Canadian.

Carrie Heard, Larry King's common-law wife, testified that when appellant was telling them about the shooting he did not seem upset at all. He told them that while he was burglarizing the pharmacy he saw car lights pull up and when he saw it was a police car he shot at it three times. The first shot went through the front windshield and hit the officer in the head. Carrie could not remember where appellant said the second shot went but she did remember appellant stating that he shot the third shot through the side window, hitting Deputy Guthrie in the arm. Appellant told Heard and King that after he shot Guthrie he heard him pleading for help because he was bleeding to death.

Also during the guilt-innocence phase, appellant took the stand and testified that he sat in the car while Larry King burglarized Ladd's Pharmacy and shot Deputy Guthrie. On cross-examination, appellant admitted that he had four prior convictions: one for burglary, one for theft, one for delivery of a controlled substance and one for passing a forged prescription in an attempt to obtain possession of a controlled substance.

We find the evidence, taken as a whole, was sufficient to sustain an affirmative answer to the second punishment issue. The circumstances of the offense itself can sustain a yes answer if they are severe enough, *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.1977), or can fail to support it if they are unsupplemented by other evidence, *Warren v. State*, 562 S.W.2d 474 (Tex.Cr.App.1978). Psychiatric testimony on the issue of future dangerousness has been held to be of probative value, *Livingston v. State*, 542 S.W.2d 655 (Tex.Cr.App. 1976), but it is not absolutely necessary to support an affirmative answer to the second special issue. In this case the brutal and callous facts of this offense, the reputation evidence, and appellant's prior criminal record were sufficient to support the jury's finding as to the issue of appellant's future dangerousness. This ground of error is overruled.

In his fourth ground of error, appellant complains that the trial court erred in admitting his oral statements which led to the discovery of the murder weapon. After the *Jackson v. Denno* hearing the trial court ruled that appellant voluntarily and knowingly made the statements and waived his rights, specifically his right to counsel which he previously had invoked. We now quote a portion of the trial court's findings of fact:

"The Court, based upon all of the evidence at such hearing, finds that the Defendant was arrested in Dumas, Texas, by Officer Robert Nuggent (sic) of the Dumas, Police Department and that shortly after his arrest he was given warnings concerning his rights not to

make a statement; that he was given all of the Miranda Rights which he stated he understood, but refused to sign a written waiver of such rights until he had an attorney. Following such he was not questioned further at that time. That District Attorney Investigator Jack Powell saw the Defendant in the office of assistant chief of police and read the Miranda Rights to the Defendant and thereafter he was arraigned before Justice of the Peace Lorraine E. Brown. Following that time the Defendant Bush advised both the Justice of the Peace and District Attorney Investigator Powell that he desired an attorney and no questioning was made following that time. The Court finds that the Defendant was confined in the County Jail at Dumas, Texas and on July 13, Texas Ranger W.P. Batten contacted the Defendant for the purpose of transporting him to Amarillo jail for safekeeping; that Ranger Batten and Deputy Hammond read the Defendant his Miranda Rights and the two transported the Defendant in an automobile to the Amarillo County Jail. That neither Texas Ranger Batten or Deputy Hammond questioned the Defendant during the time he was transported to Amarillo...."

According to the testimony of Ranger Batten, on the afternoon of July 14, Ranger Batten and D.A. investigator Kirvin Roper transported appellant to Canadian to be arraigned by the local justice of the peace. During the trip Ranger Batten asked appellant if he knew the deceased. The appellant replied that he did not and then asked the ranger why he had asked. Ranger Batten advised the appellant that both appellant and the deceased had both lived in Wheeler County at one time. The appellant then began asking the ranger questions whereupon the ranger advised appellant that under the Miranda warnings he did not have to discuss the case at all. The appellant replied that he understood the warnings and he also knew that he would probably hear testimony regarding his conversation with the ranger someday in a courtroom. Appellant and the ranger continued talking throughout the duration of the one hour and forty-five minute trip to Canadian. When the trio reached Canadian, appellant was arraigned by Justice of the Peace Frankie Hill. Batten testified that at no time during the arraignment did the appellant request an attorney. On the return trip, Batten testified that neither he nor Roper conducted an interrogation of appellant but Batten did ask appellant where the gun was and told appellant that he could save them a lot of work if he would tell them where the murder weapon was located. At first in response to Batten's inquiry, the appellant just asked Batten where he thought it was. Batten replied that he thought it had probably been thrown into Lake Meredith. Batten also testified that he told appellant several times that in Texas any oral statement he made could not be used against him unless it led to the discovery of the murder weapon or some other fruit of the crime. The conversation continued and Batten told appellant about a case he had worked on up around Spearman. Batten told appellant that this case had been written up in *True Detective* and even though Batten had made the arrest, some other officer had been given credit for it. Approximately ten miles east of Amarillo, appellant told Batten he was going to make a hero out of him and then he proceeded to tell where they could find the murder weapon.

Kirvin Roper, the investigator for the 31st Judicial District Attorney's office, testified that on the trip from Amarillo to Canadian appellant and Batten carried on a general conversation about the location of the gun. Roper testified that during the arraignment in Canadian when the justice of the peace told appellant that he had a right to an attorney appellant informed her that he did want an attorney. Appellant also told the justice of the peace that he wanted an examining trial. No attempt was made to get an attorney for appellant at that time and, after his arraignment was concluded, Roper and Batten placed appellant back in the car for the return trip to Amarillo. Roper testified that the trio

talked about the location of the gun on the return trip. Then a fifteen minute lapse occurred in this subject and Ranger Batten told appellant about the case reported in *True Detective*. After hearing this story appellant told Ranger Batten that he was going to make a hero out of him by telling him the location of the gun.

Appellant testified that during the trip Ranger Batten told him that any oral statements he made were not admissible into evidence unless they were written down. Appellant then testified that a "cat-and-mouse game" occurred during which the ranger would ask appellant where the murder weapon was located, saying that it would save him a lot of work if the appellant would tell him. In reply, the appellant would then ask the ranger where he thought it was. Appellant testified that this series of questions occurred approximately ten times during the return trip to Amarillo. Appellant testified that after Ranger Batten told him the story in *True Detective* he told the ranger he would be a hero after this and then he gave him instructions for the location of the murder weapon. In response to his counsel's questioning, appellant testified that he did not intend to give up his right to an attorney and he never stated his intention to do so.

Further testimony showed that the gun was found the next day by law enforcement officers who followed the directions given by appellant.

Appellant argues that the conduct of Ranger Batten and investigator Roper violated the law as set out in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and he likens the instant situation to the "Christian burial" speech in *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).

The State on the other hand misreads the testimony of Kirvin Roper and argues that appellant's revelation concerning the gun's location came after a fifteen minute period of silence. The State argues that initiation of conversation by appellant after this fifteen minute period of silence was conduct tantamount to a waiver of counsel under *Edwards v. Arizona*, supra.[1] A full reading of Roper's testimony, however shows that there was not a fifteen minute period of actual silence but rather that the conversation concerning this offense had ceased for approximately fifteen minutes when appellant revealed the location of the gun. However, during this fifteen minute period, Ranger Batten was telling appellant about the *True Detective* story.

In *Edwards v. Arizona*, supra, the United States Supreme Court found a violation of Edward's Fifth and Fourteenth Amendment rights when the police resumed interrogating him after he had asked to see an attorney and this interrogation resulted in a confession. The Supreme Court wrote:

"[A]lthough we have held that after initially being advised of his *Miranda* rights the accused may himself validly waive his rights and respond to interrogation, the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded

---

1. In its brief, the State makes a one-sentence statement concerning the appellant's allegation of custodial interrogation:

"The State does not agree that the facts show a custodial interrogation; but even if it is assumed for the sake of argument that a custodial interrogation had occurred on the trip from Amarillo to Canadian, the same was terminated by Appellant's arraignment in that city." (State's brief pp. 22-23).

The State does not argue that there was no custodial interrogation on the return trip to Amarillo. We find that Ranger Batten's inquiry as to the location of the murder weapon and his *True Detective* story were in fact means of custodial interrogation. As Justice Stewart wrote in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980),

"the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. at 301, 100 S.Ct. at 1689 (footnotes omitted)

to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." 451 U.S. at 484, 485, 101 S.Ct. at 1884, 1885. (citations and footnotes omitted)

■ We have previously held that once a defendant invokes his right to counsel and interrogation continues without the presence of counsel, the State has a heavy burden to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to counsel. *Phifer v. State*, 651 S.W.2d 774 (Tex.Cr.App.1983).

■ The record in the instant case shows that appellant repeatedly asked for counsel after his arrest. Appellant's last request for counsel was apparently made before the justice of the peace in Canadian approximately one hour and forty minutes before he revealed the location of the murder weapon. During this intervening time, he was in the custody of Ranger Batten and investigator Roper in an automobile traveling between Canadian and Amarillo. There is no question that Ranger Batten initiated the conversation on the return trip when he asked appellant about the location of the gun. The fact that the topic of conversation changed from the location of the gun to the story in *True Detective* is irrelevant. Unlike the State argues, there was no intervening period of silence ended by appellant's unsolicited revelation as to the gun's location. Rather the conversation during the return trip in whole appeared to be geared to obtaining this information from the appellant. See *Brewer v. Williams*, supra.[2]

We find that the State has failed to carry the heavy burden of proving that appellant knowingly and intelligently waived his right to the presence of counsel. Thus we hold that the use of appellant's oral statements at trial and the introduction of the shotgun into evidence violated appellant's rights under the Fifth and Fourteenth Amendments to the United States Constitution. *Evans v. State*, 659 S.W.2d 405 (Tex. Cr.App.1983); *Castillo v. State*, 616 S.W.2d 620 (Tex.Cr.App.1981). Contra: *Griffin v. State*, 665 S.W.2d 762 (Tex.Cr.App.1983).

However, before we dispense with this ground of error, we must consider one further issue. On direct examination during the guilt-innocence phase of the trial, appellant testified that he and Larry King went to Canadian in order to burglarize Ladd's Pharmacy. While appellant waited in the car, King broke into the pharmacy and was in the process of stealing drugs, when the victim drove up. Appellant testified that King shot Guthrie and then ran out of the store. As King ran down the street and away from where appellant was parked in the car, King tripped and fell and dropped the shotgun. King got up and continued running. Appellant testified that he got out of the car, picked up the shotgun, put it back in the car and then drove after King. Appellant caught up with King about a block and a half from the pharmacy and King got into the driver's side of the car and began driving out of town. Appellant related that they meandered throughout the countryside on dirt roads and at one point King threw the shotgun and the shells out of the car and over a fence. In response to defense counsel's questioning, appellant related that he knew he had just confessed to the burglary of the drug store and, under the particular facts of this case, felony murder.

The appellant argues in his brief that even though he testified at trial regarding the location of the shotgun, the doctrine of

**2.** Although we realize that *Brewer v. Williams*, supra, was decided on Sixth and Fourteenth Amendment grounds rather than Fifth and Fourteenth Amendment grounds as in the instant case, we find a great similarity in the two cases as to the means of extracting incriminating evidence from the two defendants.

**404** ■■■■■■■■■■■■■■■■

curative admissibility does not apply. The State has not favored us with any argument on this issue.

■■■ The doctrine of curative admissibility provides that the improper admission of evidence over objection is rendered harmless by the admission into evidence of the same facts without objection at another point during the course of the trial. *Thomas v. State*, 572 S.W.2d 507 (Tex.Cr.App. 1978) (Opinion on State's Motion for Rehearing); *Nicholas v. State*, 502 S.W.2d 169 (Tex.Cr.App.1973) (Opinion on State's Motion for Rehearing). A corollary to this rule, however, is that the harmful effect of improperly admitted evidence is not cured by the introduction of rebuttal evidence designed to meet, destroy, or explain the improper evidence. *Howard v. State*, 599 S.W.2d 597, 605 (Tex.Cr.App.1979) (Opinion on State's Motion for Rehearing); *Thomas v. State*, supra; *Nicholas v. State*, supra. In *Thomas v. State*, supra, this Court altered the Texas rule on curative admissibility in light of *Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968).

"Under *Harrison*, the 'question is not *whether* the petitioner made a knowing decision to testify, but *why*. If he did so in order to overcome the impact of the confessions illegally obtained and hence improperly introduced,' the testimony is tainted by the same illegality that rendered the confessions themselves inadmissible.

"We find that *Harrison* does in fact add a corollary to the doctrine of curative admissibility, i.e., the harmful effect of improperly admitted evidence which is obtained by illegal police practices is not cured when a defendant gives testimony on direct examination which establishes the same or similar facts unless the State can show that its illegal action in obtaining and introducing the evidence did not impel the defendant's testimony...." *Thomas v. State*, supra at p. 516.

In the instant case there is no showing by the State that the improper admission of this evidence did not impel appellant's testimony. The State has not even attempted to make such an argument in their appeal brief. Because there is no such showing, we hold that appellant did not waive his objection. *Sherlock v. State*, 632 S.W.2d 604 (Tex.Cr.App.1982); *Benavides v. State*, 600 S.W.2d 809 (Tex.Cr.App.1980); *Howard v. State*, 599 S.W.2d 597 (Tex.Cr.App.1980) (Opinion on State's Motion for Rehearing).

The judgment is reversed and remanded.

TEAGUE, J., concurs in the reversal but because he finds the legally admissible evidence is insufficient to sustain the jury's affirmative answer to special number 2, he would order that upon retrial the maximum possible punishment that may be assessed is life imprisonment.

WHITE, J., concurs in the result.

W.C. DAVIS, J., dissents.

CLINTON, J., not participating.