**Frank Galen MORRIS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09–83–202 CR.**

Court of Appeals of Texas,
Beaumont.

Aug. 28, 1985.

Opinion Denying Motion for Rehearing
Sept. 26, 1985.

Houston Thompson, Silsbee, for appellant.

Patrick O. Hardy, Asst. Dist. Atty., Woodville, for appellee.

## OPINION UPON REMAND

BROOKSHIRE, Justice.

By indictment, the Appellant was charged with the felony offense of burglary of a habitation with intent to commit theft. Appellant pleaded not guilty. The jury found Appellant guilty and, with an enhancement paragraph, set his punishment at 30 years confinement. In an unpublished opinion we affirmed the trial court.

A petition for discretionary review was filed. The Court of Criminal Appeals, on June 21, 1985, pursuant to the authority conferred on it by *TEX.CODE CRIM. PROC.ANN. art. 44.37, art. 44.45(b)* (Vernon Supp.1985), and *TEX.R.CRIM.APP.P. 304(a)*, granted Appellant's petition for discretionary review summarily. The Court of Criminal Appeals, in its opinion, wrote:

"Appellant, in his first Ground of Error, citing *Edwards v. Arizona*, 451 U.S. 477, 68 L.Ed[.]2, 378, 101 S.Ct. 1880 (1981), argues that the Court of Appeals erred in finding that his confession was properly admitted since he had requested counsel. He avers that his request was ignored."

The remand to us is limited to the admissibility of Appellant's confession. The Court of Criminal Appeals expressed no opinion on that issue.

The trial judge conducted a hearing pursuant to *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R.3d 1205 (1964). Appellant's petition for review relied upon two grounds of error. First, it was error to admit the Appellant's confession over the objection that the Appellant had been denied right of counsel. Second, the trial court erred in admitting Appellant's confession when, Appellant argues, the undisputed evidence shows the confession was the result of torture and duress inflicted by peace officers and there was no positive evidence that the duress had ceased to operate on the Appellant's mind beyond a reasonable doubt.

We will try to fairly summarize the conflicting testimony at the *Jackson v. Denno* hearing. The version of the Appellant will be summarized first. Morris swore that he was arrested by the Silsbee Police Department for the San Jacinto County Sheriff's Office. A sergeant and chief of police of the Silsbee force came to Morris' shop about 5:00 P.M. and put him in their car. He was not allowed to contact his personally selected lawyer. The police did allow Morris to give a message to a friend to notify his attorney. Morris testified that he stayed at the Silsbee Police Department about 10 minutes; that he was shoved down a hall; that they put a belt around him, handcuffed him and pushed him into an office at the police station.

A Justice of the Peace, Robert Ward, was in that office. Morris swore that he asked to be permitted to make a telephone call but was told he would be able to do that when he arrived in San Jacinto County. Again, it must be stressed that this is the account of the events as related by the Appellant. He said he was not allowed to make a phone call to his lawyer either in San Jacinto County or in two other counties he was taken to afterwards. Morris swore

that he advised the officials in each of the three counties that he knew a lawyer; he had talked to his lawyer and he wanted to contact that personally selected lawyer. Referring to the officers, Morris said: "Every one of them knew that I had just to contact Houston." *He stated he had actually contacted his lawyer ahead of time— maybe as much as two or three weeks before his arrest* —because another person had attempted to implicate the Appellant in the theft of a lawnmower.

Appellant swore that his arrest was conducted in a way so that he could not contact his previously consulted attorney. He swore neither the justice of the peace nor the Silsbee police would permit him to call counsel. Morris testified "It was ordered from somebody in Silsbee for me not to call because everybody knew—every one of them knew that I had a lawyer." Morris said the Silsbee justice of the peace did set a bond. During the time, either in the Silsbee Police Station or immediately outside, Morris swore that at least two peace officers slung him against the wall and one threw him into the back seat of a deputy's vehicle.

He testified that after he was "chunked" into the back seat of a deputy's car, two great big men, who were deputies from San Jacinto County, took him for a ride over some rural roads in Polk County. The San Jacinto County deputies took him, according to Morris' version, to the Lake Livingston Dam, where they stopped and talked to Morris. At the Dam, there "wasn't nothing but water on both sides." Since it was late at night, Morris was taken to the San Jacinto jail. All night long, he said, the officers were "steady bothering me". Morris said that he was physically abused while in the San Jacinto County jail and that there were "law men all night long coming and going in there." He described these deputies:

"I went with two big—great big—men. Big old boys. Some kind of deputies or something from San Jacinto County."

The Appellant stated, while in San Jacinto County:

"... they put a towel on my face, poured water on it, liked to have drowned me. Held my breath as long as I could, and I couldn't shake it off because what they do is put this towel up and fold it about three ways."

He also testified that he was in deep fear in San Jacinto and was still in fear when he signed the confession.

Later, he said he was taken to Polk County. The Appellant testified that the sheriff of Polk County had a long talk with him but that the sheriff was real nice to him. Morris said he told the sheriff of Polk County all about what "Humpy Parker and them did to me over there." Morris testified that while in the San Jacinto jail they put him through water torture by "laying you down with handcuffs behind you and putting a towel over your face and pouring a pitcher of water on it." Morris repeated that he was tortured in San Jacinto County and at other times the officers made him say some things he didn't want to say and that this treatment had been happening to him for a long time. Morris stated:

"I mean every time I've been arrested I keep my mouth shut, and all of a sudden these people start jumping on me. I guess I will tell them anything they want to know after they threaten my life and stuff."

Later, Morris was transported to Tyler County. He testified that after he had made his statement as a result of custodial investigation one of the deputy sheriffs in Tyler County finally let him make a phone call to his attorney. He also testified that he was in deep fear in San Jacinto County and was still in fear when he signed the confession.

Before giving his statement Morris was taken before a lady justice of the peace in Tyler County, apparently in Woodville. He testified:

"I told that judge lady in there that I needed to talk to you. And she said that I could make a phone call. She was real nice about it. She said that she would tell one of the officers to let me make a

phone call. And when they came in there and got me in the office with the judge, she told them he would like to make a telephone call to his attorney.

"And that's when they put me in the little cell a little while and come back and got me, and I thought I was going to get to call, and I got B.J. instead.

"Q. And he would not let you call me?

"A. He would not let me call you." Apparently, shortly thereafter, the confession was signed. According to Morris' testimony, he had been in the Tyler County jail on⌐ full day and a night after the lady justic. of the peace had granted him a telephone call before he was actually able to call his attorney.

Morris vehemently maintained that it would do no good for him or his lawyer to subpoena the various peace officers involved because he was accusing them of brutality and ill treatment. Hence, their testimony would not substantiate or corroborate his testimony concerning the several denials of his right to make a telephone call or more than one telephone call if necessary to actually contact his personally selected attorney. *It must be remembered that he consulted with his attorney prior to his arrest.*

The chief deputy of the sheriff's office in Tyler County was called to testify by the State on rebuttal. At no time during his testimony did he actually contradict Appellant's testimony that his demand to call his lawyer had been thwarted. We have carefully read the entire testimony of this chief deputy and no one specifically asked him (neither the State's attorney nor the defense attorney) about his personally refusing to allow the Appellant to make a telephone call. It simply was not inquired about.

The Appellant's attorney testified that he had made several attempts to locate Morris by calling the Silsbee police department, the sheriff's office in San Jacinto County and the sheriff's office in Polk County without success. It must be repeated that the above is a summary of the version given by the Appellant and his attorney, excepting Vardeman's evidence.

After the Appellant's petition for discretionary review was filed, the State answered by saying: "[T]he State would ask this Honorable Court [Court of Criminal Appeals] to refer to the State's Reply to Appellant's Ground[s] of Error Numbers I. through V. in State's original brief."

The State relied on the testimony of the chief deputy of Tyler County, B.J. Vardeman. His testimony at the *Jackson v. Denno* hearing, in summary, was that he had served approximately thirty years as a law enforcement officer; that on January 19, 1983, he had received a statement from Morris; that Morris signed the statement in his presence; that before the statement was signed by Morris he had been brought before a magistrate and given the proper warnings; that, in addition thereto, deputy Vardeman gave Morris all of the Miranda warnings; that while Morris was in the presence of Vardeman the Appellant was not coerced, forced or threatened in any way to make a statement; that Morris was not nervous or scared, nor did he have any bruise or marks on him at the time of the statement. It was Vardeman's further testimony that the statement was given freely and voluntarily and at no time did the defendant ask for an attorney. Later, on cross-examination, chief deputy Vardeman stated that, not only had Mr. Morris stated he did not want to have an attorney present, but he signed a sworn statement that he would answer law enforcement officers' questions without the presence and advice of an attorney. Vardeman further testified on cross-examination that when anyone in custody asked for an attorney "We get them one."

The only witness offered by the State on the *Jackson v. Denno* hearing was B.J. Vardeman. We do not perceive how Vardeman could have known about the past episodes that Morris had with the peace officers before arriving in Woodville. Vardeman *specifically swore* that he told Morris that he had a right to have a lawyer to advise him before and during any ques-

tioning; that he had the right to have his own lawyer present and, if he was unable to hire a lawyer, that the court would appoint a lawyer for him free of charge; that Morris could stop talking at any time; that all these rights were continuing rights and could be invoked by Morris at any stage of the proceeding; that prior to questioning Morris he had been taken before a magistrate. Vardeman *specifically swore* that Morris did not want an attorney to advise him at the time of the taking of his custodial confession; that Wanda Johnson and John Bowen witnessed the statement. Morris did not tell Vardeman that he had been beaten up at any time by anybody. No one to Vardeman's knowledge had exerted any force, threat, persuasion or made any promise to Morris to get him to answer questions or give the statement.

■ We have carefully reviewed the findings of fact and conclusions of law made by the able trial judge. A careful reading and analysis of the findings of fact and conclusions, supported by probative evidence, leads us to find that the complaint of the Appellant that his confession was the result of torture and duress inflicted by custodial officers in Hardin and San Jacinto Counties is not sound. No reversible error is shown. Based upon findings of fact, the trial judge made the following conclusions:

"1. The statement was voluntarily and freely given, after proper warnings and waiver of rights, without coercion, promises and is admissible as a matter of law and fact.

"2. There was no causal connection between the giving of the statement and the events that may have transpired prior to his being taken into custody by Tyler County. Any effects of any wrongful conduct in other counties was broken by Defendant's treatment in Polk and Tyler count[ies].

"3. Defendant's motion to quash the statement is without merit."

The Appellant himself stated that he had been well treated in Polk County; that the sheriff of Polk County had not abused him but had treated him "nice" and that he had been well treated by the justice of the peace and the law enforcement officers in Tyler County.

Under this unique record and acquiescing in the proper duties and prerogatives of the trial judge, we must again find the confession itself free of imperfections.

However, this leaves us with the knotty problem involving alleged refusal of counsel to Appellant after his repetitious requests. While writing this opinion, we became aware of the case of *Bush v. State,* 697 S.W.2d 397 (Tex.Crim.App.1985). In *Bush, supra,* the appellant complained that the trial court erred in admitting his oral statements which led to the discovery of the murder weapon. A *Jackson v. Denno* hearing was held and the trial court made findings that the defendant, Bush, voluntarily and knowingly made the oral statements and waived his rights, particularly his right of counsel, which he had previously invoked. The high court reversed on this point.

The background facts of *Bush, supra,* and this appeal are different. However, similarities exist. In *Bush, supra,* the defendant asked for an attorney several times or, at least, made a request to be permitted to get in touch with an attorney. He was never afforded a realistic opportunity to do so. Bush was transported by a ranger on a 45 minute trip to the town of Canadian to be arraigned by the local justice of the peace. During the trip, and the return trip, to Amarillo, the ranger and Bush engaged in a conversation. Bush had requested an attorney before the justice of the peace at Canadian. Bush demanded an examining trial. During the return trip to Amarillo, there was a lapse of 15 minutes during which there was no conversation. Later, Ranger Batten told him that any oral statements made by Bush would not be admissible into evidence unless reduced to writing. Bush then testified that a "cat and mouse game" occurred where the ranger would ask the appellant where the murder weapon was located saying that it

would save him, the ranger, a lot of work if the appellant would tell him.

At one point, the ranger told Bush about a story that appeared in a magazine "True Detective", wherein he, the ranger, had done all the work but another law enforcement officer had received all the credit. After the story about the "True Detective" magazine, the *appellant told the ranger that he would make a hero out of the ranger.* Then he gave him instructions as to the location of the murder weapon; but, during the *Jackson v. Denno* hearing, the appellant repeatedly testified that he did not intend to give up his right to an attorney.

The Court of Criminal Appeals, in its July 24, 1985, opinion, cited *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), which case involved the so called "Christian burial" speech. The Court of Criminal Appeals did not cite or discuss the more recent cases of *Wyrick v. Fields*, 459 U.S. 42, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982), and *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). These two recent cases, we think, greatly limit *Edwards v. Arizona, supra.* We conclude that when Bush told Ranger Batten that he was going to make the ranger a hero that promise was more of an initiation and made Bush more of an initiator than the innocuous question in *Bradshaw, supra,* that simply asked: "Well, what is going to happen to me now?"

In view of the *record before us as it now stands,* and especially the findings of fact and conclusions of law made by the learned trial judge (lacking findings on Morris' demands for counsel) and especially in view of the fresh case of *Bush, supra;* we would feel constrained to reverse the judgment and remand the case for another trial on issue of refusal of counsel.

However, in the interest of the proper administration of the criminal justice system and also in the interest of the economy and responsible fiscal management of the criminal justice system, we would respectfully request of the Court of Criminal Appeals and strongly recommend to them that they remand this case to the trial court for additional findings and conclusions. The reason for this is that the trial judge made no findings of fact or conclusions of law concerning whether or not the Appellant actually demanded to call his lawyer. The trial court had the right to disbelieve Morris. We sincerely think that the trial judge should be given this opportunity, especially in view of the recent pronouncements of the Supreme Court of the United States in *Oregon v. Bradshaw, supra.*

Therefore, subject to the further actions and orders of the Court of Criminal Appeals, we feel it is necessary, and we are constrained, under *Bush, supra,* to reverse the judgment and remand the cause for new trial; subject to, however, an additional remand by the Court of Criminal Appeals to the district judge for the specific purpose of additional findings of fact and conclusions of law consistent with our recommendation.

If the attentive district judge is not given a reasonable opportunity to make findings of fact and conclusions of law as to whether or not he believed to any degree Morris' testimony demanding the services of his previously selected personal attorney; then, in this case, the State faces a difficult and knotty problem. This is true because regardless of how carefully and conscientiously the *Jackson v. Denno* hearing is conducted, and regardless of how free and voluntary and admissible the custodial confession is; nevertheless, if there is any testimony prior to the custodial confession—at any time prior thereto—that the defendant said he requested counsel; then, the net effect would be that the prosecutors, law enforcement officers, and peace officers of the State of Texas will, as a practical matter, absolutely have to cease to investigate even serious atrocious crimes insofar as, but only insofar as, questioning

the defendant. This would be so even though the custodial confession was free and voluntary and entirely devoid of any duress or any other impropriety or infirmity.

In our instant appeal, for example, the Appellant stated that he would not call the various officers and officials at the *Jackson v. Denno* hearing to either substantiate or deny his own statements because he was accusing them of ill treatment, duress and brutality.

Hence, as a practical matter, the State found itself in a difficult position. After Morris testified about *his version of the happenings or events* that took place in Silsbee, in Hardin County, in Polk County, at the Livingston Dam, and in San Jacinto County—*and again we stress it is his version* —then the State, as a practical matter, was in an impossible position to produce on the stand the several peace officers and officials that Morris accused of ill treatment, brutality and denying his right to contact counsel. Morris did not name or identify all of his protagonists.

But, again, it must be remembered that the trial judge had the right and prerogative to disbelieve totally the Appellant's version. The trial judge was certainly in a superior position to pass upon the truthfulness of Morris' statements on this point. We cannot and should not do so.

If an alleged request to contact counsel per se absolutely defeats the admissibility of any later custodial confession—regardless of how much time has passed—then the use and admissibility of free and voluntary confessions will, as a practical matter, cease. Hence, these free and voluntary confessions will be no longer available to peace officers and prosecutors even in the trial of heinous felonies. This result would place an additional onerous burden on law enforcement in Texas.

Hence, our recommendation to the Honorable Court of Criminal Appeals is most zealously and conscientiously urged.

REVERSED AND REMANDED, provisionally, subject to further action by the Court of Criminal Appeals.

## OPINION ON STATE'S MOTION FOR REHEARING

At the conclusion of the *Jackson v. Denno* hearing [378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R.3d 1205 (1964)], the trial court verbally announced from the bench the following:

"The Court has considered the testimony given during the Jackson-Deeno [sic] hearing yesterday and the argument of counsel and the legal authority presented this morning. Looking at the totality of circumstances, it it [sic] my decision that the statement given here in Tyler County was voluntary. The motion to suppress is overruled. I find that the intervening circumstances between anything that occurred in San Jacinto or Hardin County dissipated by conduct and events occurring in Polk and Tyler County, that the proper warnings were given, that the defendant was not denied counsel. He waived counsel. And that the statement is admissible. I will make more detailed findings and conclusions and submit them in writing and file them as a part of the papers of this case prior to the conclusion of this trial."

The "Findings and Conclusions" were filed on June 16, 1983, by the presiding judge. The first paragraph reads:

"Following a hearing outside the presence of the jury on Defendant's motion to suppress *a statement given by him to Tyler County Sheriff's Office, the following findings and conclusions are made:* " (Emphasis ours)

One of the findings of fact was:

"5.  Defendant was advised that he could have an attorney, was not denied an attorney, but voluntarily and knowingly waived his right to an attorney."

One of the conclusions reads as follows:

"1. The statement was voluntarily and freely given, after proper warnings and waiver of rights, without coercion, promises and is admissible as a matter of law and fact."

We tend to agree that by a faint, remote implication the trial court may have found that the Appellant did not, at any time, request or demand legal counsel. But, on balance, it seems that the verbal pronouncement made from the bench does not squarely address the contention that the Appellant requested and demanded legal counsel immediately after his arrest and at other times. By similar reasoning, we think that the written findings and conclusions, filed June 16, 1983, do not squarely decide if the Appellant demanded legal counsel immediately after his arrest and at later times. Certainly, there is no finding that this Appellant initiated the events that lead to the statement given to the deputy sheriff of Tyler County.

Nevertheless, the trial judge may have felt that the Appellant never requested or demanded counsel prior to the giving of the statement. We think this decision is properly the duty and prerogative of the trial judge.

■ In substance, the Appellant argued, in his petition for discretionary review, that our Court of Appeals erred in finding that his confession was properly admitted since he had requested counsel. Appellant avers that his request for counsel was ignored. The Court of Criminal Appeals' finding was that our Court of Appeals had not sufficiently considered this contention. Therefore, in order to sufficiently and adequately rule upon this contention, we must remand this issue or question to the trial court for more detailed findings of fact and conclusions of law.

We, therefore, consistent with the opinion of the Court of Criminal Appeals, remand this cause to the District Court for further proceedings in accordance with this opinion.

REMANDED.